917 A.2d 276 (2007)
391 N.J. Super. 113
Michael PIZZULLO and Dorothea Pizzullo, Plaintiffs-Respondents,
v.
NEW JERSEY MANUFACTURERS INSURANCE COMPANY, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued November 9, 2006.
Decided March 8, 2007.
*277 Kevin M. Shanahan, Pennington, argued the cause for appellant.
Anthony J. Monaco, Freehold, argued the cause for respondents (Gerald R. Stockman, attorney, West Trenton; Mr. Monaco, on the brief).
*278 Before Judges CUFF, WINKELSTEIN and FUENTES.
The opinion of the court was delivered by
FUENTES, J.A.D.
Plaintiffs, Michael and Dorothea Pizzullo, filed this declaratory judgment action seeking a determination from the Law Division that they were each entitled to $500,000 in underinsured motorist (UIM) benefits, under a single policy of insurance issued by defendant New Jersey Manufacturers Insurance Company (NJM). Plaintiffs' claim for damages arose out of a 1998 accident in which they were both severely injured while riding Michael's[1] motorcycle. In their suit, plaintiffs allege that ten years before the accident, in 1988, an NJM customer service representative had orally assured them that the policy's UIM coverage limit of $500,000 applied to each of them individually, thus providing a combined maximum benefit of $1,000,000.
NJM rejected plaintiffs' claim, arguing that the policy renewal forms executed by plaintiff over the ten-year period prior to the accident, the information contained in the accompanying Buyer's Guide, and the policy document itself, all indicated that the policy's maximum UIM benefit was $500,000 per accident, not per named insured. NJM also argued that, even if its customer service representative had given plaintiffs erroneous information as to the maximum UIM benefits provided by the policy, in the absence of evidence showing willful, wanton, or grossly negligent acts on its part, plaintiffs' action was barred by the provisions of N.J.S.A. 17:28-1.9a.
These issues came before the trial court by way of NJM's motion for summary judgment. The motion judge rejected NJM's position. The court held that, despite NJM's compliance with the provisions of N.J.S.A. 17:28-1.9b, and the regulations promulgated thereunder by the Commissioner of Banking and Insurance, NJM was not entitled to the immunity granted by the statute because it made affirmative misrepresentations as to the scope of the policy's UIM coverage.
The matter was then tried before a different Law Division judge as a bench trial. After considering the evidence presented, the trial judge reaffirmed the earlier ruling made by the judge who heard and denied NJM's motion for summary judgment. Relying, in part, on our opinion in Botti v. CNA Ins. Co., 361 N.J.Super. 217, 225, 824 A.2d 1120 (App.Div.2003), the trial court rejected plaintiffs' claim for reformation.[2] The trial court held, however, that NJM was equitably estopped from denying the UIM coverage sought by plaintiffs, and entered judgment in their favor in the amount $800,000, together with $75,060 in prejudgment interest.
NJM now appeals from this judgment. After carefully reviewing the record, and in light of prevailing legal standards, we reverse. We hold that equitable considerations cannot trump the public policy enunciated by the Legislature in N.J.S.A. 17:28-1.9, conferring immunity to insurance carriers in actions brought by the named insured to recover damages based on the election of a given motor vehicle insurance coverage.
An insurance carrier seeking the immunity protections under N.J.S.A. 17:29-1.9a, *279 must prove that: (1) the coverage limits provided to the named insured were at least the minimum coverage required by law; (2) the damages alleged by the named insured were not caused from a willful, wanton or grossly negligent act of commission or omission; and (3) the carrier satisfied the special coverage selection requirements of N.J.S.A. 17:28-1.9b.
We emphasize that when, as here, the carrier's compliance with the requirements (1) and (3) is not disputed, a reviewing court must then determine whether the carrier's actions amount to more than simple negligence. Stated differently, absent a judicial finding that its actions were willful, wanton, or grossly negligent, an insurance carrier is immune from law suits based on allegations that it provided its insured with erroneous information as to the scope of the policy's coverage.
Here, NJM is entitled to the immunity provided in N.J.S.A. 17:28-1.9a because: (1) the UIM coverage provided to plaintiffs was in excess of the minimum amount required by law; (2) it complied with the requirements of N.J.S.A. 17:28-1.9b, by supplying plaintiffs with the Buyer's Guide approved by the Department of Insurance, and it obtained from plaintiffs fully executed coverage selection forms, as prescribed by N.J.S.A. 39:6A-23; and (3) providing erroneous information to plaintiffs as to the scope of their policy's UIM coverage, ten years before the accident that triggered the policy's UIM provisions, does not rise to the level of a willful, wanton, or grossly negligent act. Thus, plaintiffs' suit is barred by the immunity provisions of N.J.S.A. 17:28-1.9a.

I
The trial judge's factual findings were set out in a comprehensive oral opinion delivered from the bench.[3] These findings are well supported by the evidence, and are thus binding upon us here. Vergopia v. Shaker, 383 N.J.Super. 256, 262, 891 A.2d 664 (App.Div.) (quoting Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474, 484, 323 A.2d 495 (1974)), certif. granted, 187 N.J. 83, 899 A.2d 305 (2006).

A

NJM's Erroneous Coverage Advice
The trial judge specifically found that, in 1988, Michael telephoned NJM and spoke to Customer Service Representative Linda Middleton about purchasing a policy of insurance for his wife Dorothea.[4] He asked Middleton for a policy in Dorothea's name, to cover a car the couple had recently acquired in Dorothea's name.
The court found that Michael had "a practice of requesting high amounts of coverage, often the highest available." Thus, in requesting a policy in his wife's name, Michael "wanted to make sure that his wife had the same good protections that he had." In response to this inquiry, Middleton told Michael that a separate policy was not necessary because his wife could obtain the "identical" or "similar" coverage by adding her new car to Michael's existing family policy.
*280 Relying on Middleton's representation, Michael added his wife's new car to his existing auto policy. Thereafter, the declaration page for the policies issued by NJM to the Pizzullos from 1988 to 1998 (the latter being the coverage year when the accident occurred), showed $500,000 for liability coverage, per car, per accident; and $500,000 per car for UM/UIM coverage. The declaration page did not contain an explicit notation that the UM/UIM coverage was provided on a per accident basis. The policy document itself, however, contained a separate UM/UIM provision, stating that the UM/UIM benefits could not exceed the maximum liability coverage described in the declaration page.
Middleton testified that in 1987, it was her practice, as an NJM customer service representative, to tell individuals who inquired about obtaining coverage for a spouse's car, to simply add the spouse's car to the existing policy, and not to purchase a separate policy. According to Middleton, it was NJM's "primary practice" for her to tell such callers that adding their spouse's car to their existing policy would provide them with the same level of coverage, as if they purchased a separate policy for the spouse's new car. Middleton's erroneous advice was consistent with NJM's protocol at the time; and was known and approved by NJM's upper management.
John Fink, an individual described in NJM's appellate brief as "a representative of NJM with extensive underwriting experience," confirmed that, in 1988, NJM discouraged the insured from acquiring a separate policy in his wife's name. Thus, if an insured had requested a separate policy for his spouse to cover a new car titled in her own name, the customer service representative was trained to tell that insured that it was NJM's general practice to add the new vehicle to the existing family auto policy. Although separate policies were available, it was NJM's practice to reserve such policies for spouses who were separated or divorced.
The consequences of such erroneous advice are made manifest by plaintiffs' plight. As the trial court noted:
[T]his NJM advice was not completely accurate at the time it was given. [Mr. Fink] testified unequivocally that if Mrs. Pizzullo had purchased a separate policy, she would have a maximum of $500,000 for UM and UIM, for the accidents that led to this lawsuit and that Mr. Pizzullo would also have had a separate maximum of $500,000 of UM/UIM for the injuries that led to the filing of this lawsuit.
. . . .
Mr. Fink also stated . . . that it was a disservice to the customer not to make the UM/UIM consequences clear to the customer before they made their decision whether to add a spouse's new car to an existing policy or to purchase a separate policy for the spouse.
A fair reading of Mr. Fink's testimony is that it was simply not on NJM's radar in 1987 and for quite a few years thereafter, it appears, that denying separate policies to married couples or recommending that separate policies not be obtained by married couples would affect the total amount of UM/UIM coverage available to them if they were both severely injured in the same accident in which they were occupying the same vehicle.
From this record, we are satisfied that the trial court correctly found that, in response to plaintiffs' telephonic inquiry, NJM misinformed plaintiffs of the extent of their UIM coverage; and that this misrepresentation was the product of an erroneous appreciation of the UIM coverage consequences resulting from providing a *281 single family policy to insure all vehicles owned by married individuals.

B

Documentary Evidence
NJM presented in evidence a series of policy renewal forms executed by plaintiffs from 1988 to 1998, together with the Buyer's Guide booklet approved by the Commissioner of Insurance. Commencing in 1988, plaintiff used these forms to select the amount of UIM coverage he wanted in his auto policy. The trial judge found that these forms were written "in plain English," setting forth each category of coverage. Plaintiff consistently selected $500,000 in liability coverage and an equal amount of UIM coverage. The actual language in the UIM selection form read as follows:
How much coverage do you choose for damage which another driver who has little or no insurance may do to your car, your family, your passengers or yourself? NJM is required by law to offer this coverage up to the liability limit you have selected but no more than $500,000. Your uninsured/underinsured motorists coverage may not exceed the liability limit you have chosen. NJM does not offer $1,000,000 uninsured/underinsured motorists coverage.
Along with the coverage selection forms, NJM also provided plaintiffs with the Buyer's Guide booklet approved by the Department of Insurance. This Guide apprised plaintiff that the UIM coverage limit could not exceed the amount of liability, and advised the reader to call a customer service representative to request further information or clarification. Thus, although the Buyer's Guide, the renewal forms, and the policy's declarations page did not explicitly address the separate coverage issue involved here, these documents all included clearly written statements concerning the maximum amount of UIM coverage provided in the policy.
Plaintiffs nevertheless argued that: (1) the separate premium for each car reflected in the declarations page; and (2) the absence of clear language in the declarations page indicating that the UIM coverage was "per accident;" created a plausible expectation in plaintiffs' minds that the UIM coverage Michael requested in 1988 was provided in this family policy. The trial court nevertheless noted that it was "crystal clear . . . [that] the amount shown on the dec sheet [with respect to liability coverage] is a per accident amount and not a per person amount."[5]

C

Trial Court's Ruling on Immunity
Against these factual findings, the trial court rejected NJM's claim for immunity under N.J.S.A. 17:28-1.9a, noting that plaintiffs' claims were predicated upon NJM's "affirmative misrepresentations upon which [plaintiffs] relied in agreeing to add Dorothea Pizzullo's new car to Michael Pizzullo's policy instead of purchasing a separate policy for her." According to the trial court, in adopting N.J.S.A. 17:28-1.9a, the Legislature intended to immunize insurers only from claims based on an insurance company's failure to inform an insured of the various coverage options available. The trial judge emphasized *282 that plaintiffs' claims lay outside the statute's protection because
the Pizzullos knew what the options were in terms of coverage, but what they did not understand and what they sought guidance for was whether it made a difference to add Dorothea to the policy or for her to get a separate policy, and that simply is not explicitly discussed on the face of theselection document or in the Buyer's Guide. And, therefore, this case comes outside of the immunity.
Despite reaching this conclusion, the court denied plaintiffs' application for reformation of the policy to provide for separate $500,000 UIM coverage for each plaintiff, for a total cumulative coverage of $1,000,000. The court instead grounded the relief available to plaintiffs upon equitable principles of estoppel. The court determined that NJM was equitably estopped from repudiating the affirmative representation of coverage it made to Michael ten years before the accident at issue.

II

Legal Analysis
We begin our analysis by examining the immunity provided by the Legislature to insurance carriers like NJM. N.J.S.A. 17:28-1.9a became effective on June 29, 1993. It provides, in pertinent part, as follows:
Notwithstanding any other provision of law to the contrary, no person, including, but not limited to, an insurer . . . shall be liable in an action for damages on account of the election of a given level of motor vehicle insurance coverage by a named insured as long as those limits provide at least the minimum coverage required by law or on account of a named insured not electing to purchase underinsured motorist coverage, collision coverage or comprehensive coverage. Nothing in this section shall be deemed to grant immunity to any person causing damage as the result of his willful, wanton or grossly negligent act of commission or omission.

[(Emphasis added.)]
It is now well-settled that
in order for the subsection a immunity to apply to policies issued on and after the effective date of N.J.S.A. 17:28-1.9, the special coverage selection requirements of subsection b must be met. If the policy was issued prior to that date, the general coverage selection requirements must be met. Thus, we hold that the immunity does not apply to coverage selections made without benefit of the coverage selection form and the insured's execution thereof.
[Avery v. Wysocki, 302 N.J.Super. 186, 191, 695 A.2d 283 (App.Div.1997).]
Thus, in order to assert successfully the immunity granted by N.J.S.A. 17:28-1.9a, in an action for damages based on the election of a given level of insurance coverage by a named insured, an insurance carrier must prove that: (1) the coverage limits provided to the named insured were at least the minimum coverage required by law; (2) the damages alleged by the named insured were not caused from a willful, wanton or grossly negligent act of commission or omission on its part; and (3) it satisfied the special coverage selection requirements of N.J.S.A. 17:28-1.9b. An insurance company that fails to satisfy any one of these three requirements is not entitled to the immunity protections in N.J.S.A. 17:28-1.9a. Conversely, an insurance company that demonstrates compliance with all three statutory requirements is entitled to immunity as a matter of law.
Here, it is not disputed that NJM sent plaintiffs the Buyer's Guide approved by *283 the Department of Insurance. N.J.S.A. 39:6A-23c. Plaintiffs also executed the renewal forms reflecting the information prescribed by N.J.S.A. 39:6A-23c. Thus, the only remaining issue is whether NJM's actions misstating the maximum UIM benefits provided in the policy rises to the level of a willful, wanton or grossly negligent act.
In Strube v. Travelers Indemnity Co., 277 N.J.Super. 236, 240-42, 649 A.2d 624 (App.Div.1994), aff'd, 142 N.J. 570, 667 A.2d 188 (1995), we described in detail the tumultuous history of litigation predating the adoption of N.J.S.A. 17:28-1.9. During these times, our courts recognized the cognizability of "claims in which insureds alleged that they received improper or insufficient advice from insurance agents or brokers concerning the [coverage] options available to them." Id. at 241, 649 A.2d 624. These claims were predicated upon the then-prevailing legal standard that insurance companies, acting through their agents, were obligated to exercise good faith and reasonable skill in advising an insured as to the coverage provided in his policy. Weinisch v. Sawyer, 123 N.J. 333, 341, 587 A.2d 615 (1991).
All this came to an end when the Legislature adopted N.J.S.A. 17:28-1.9a effective on June 29, 1993. As we emphatically declared in Strube, "N.J.S.A. 17:28-1.9a was intended to put an immediate end to this explosion of litigation by providing blanket immunity except in cases of willful, wanton, or gross negligence." Strube, supra, 277 N.J.Super. at 242, 649 A.2d 624. Thus, claims sounding only in negligence are barred as a matter of law. Furthermore, although not raised as an issue by the parties, we note that the immunity conferred by the statute is applied retroactively to "all antecedent policies." Ibid. Thus, although NJM's conduct here preceded the effective date of the statute by five years, it is nevertheless entitled to the protection of the statute.
N.J.S.A. 17:28-1.9a does not define the terms "willful, wanton or grossly negligent." We will thus look to definitions of these terms in parallel statutes. The Punitive Damages Act (PDA) defines the terms "wanton" and "willful" as "a deliberate act or omission with knowledge of a high degree of probability of harm to another and reckless indifference to the consequences of such act or omission." N.J.S.A. 2A:15-5.10. The PDA, however, does not distinguish between willful and wanton conduct. By contrast, in adopting N.J.S.A. 17:28-1.9a, the Legislature used the disjunctive to describe the conduct that fell outside of the statute's immunity protection. Thus, the words "willful, wanton, or grossly negligent" must be given their own individual definition, in order to avoid rendering them "inoperative, superfluous, or meaningless." State v. Reynolds, 124 N.J. 559, 564, 592 A.2d 194 (1991); see Found. for Fair Contracting, Ltd. v. N.J. State Dep't of Labor, 316 N.J.Super. 437, 444, 720 A.2d 619 (App.Div.1998).
Using the definition provided in the PDA as a guide, we hold that, in this context, "willful" refers to a deliberate or intentional act. An insurer will be held liable under the statute for its "willful" conduct, if it deliberately misrepresents the scope of available coverage in a given policy. "Wanton" encompasses conduct showing an extreme indifference or reckless inattention to material details that results in damages to the insured. Though lacking the characteristics of intent involved in a willful or deliberate act, a wanton act nevertheless connotes an utter disregard for the rudimentary responsibility of providing complete and accurate information to the insured regarding *284 the available coverage under a particular policy of insurance.[6]
Section 5.09 of the Model Civil Jury Charges defines "gross negligence" as
an act or omission, which is more than ordinary negligence, but less than willful or intentional conduct. Gross negligence refers to a person's conduct where an act or failure to act creates an unreasonable risk of harm to another because of the person's failure to exercise slight care or diligence.
Given the legislative history of the statute described in Strube, and incorporating the basic definitional elements in the model charge, we are satisfied that, in this context, a grossly negligent act is a deviation from the standard of reasonable professional conduct expected from an insurance carrier, that is less than wanton, but more than simple negligence. Thus, in adopting the "grossly negligent" standard concerning acts of "commission or omission," the Legislature did not intend to render an insurer liable for good faith misrepresentations regarding the amount of insurance coverage available under a particular factual scenario.
Applying this standard to the issues presented here, we hold that to trigger liability under the "grossly negligent" standard of care, an insured must prove that: (1) he or she sustained damages resulting from the election of a given level of coverage; (2) the alleged improper election of coverage was caused by an act of commission or omission by the insurer; and (3) this act of commission or omission was the result of a gross negligence; that is, a high level of incompetence, inattention, or indifference that involves more than simple negligence.
We will now apply these analytical standards to the facts presented here. In the course of delivering its findings and conclusions, the trial court made the following observations and characterizations:
I also want to say that this case is a hard [case] to decide because there are strong arguments for both sides. [] In addition, the witnesses for both sides were credible and likable. The plaintiff was certainly likable, came across as candid, struggling with the handicap he's been left with as a result of the motorcycle accident, trying to be extremely precise in his testimony, making a real effort. And NJM's employees also made a favorable impression on me, each one of them. They were forthright, and they were candid. And they gave a face to what might otherwise be a monolithic insurance company.
In light of that, I've also been struggling to understand how this situation came about. It's clear, at this point, to everyone involved that the difference in the underinsured and uninsured motorists coverage between adding a spouse and purchasing a new policy, that there is a difference. But it was not clear, certainly to [the NJM customer service representative], certainly not to [the NJM senior customer service representative], and as I said earlier, the distinction, the difference was not on the company's radar in 1987, and for at least a few years thereafter.

And I keep on saying, "Why?" I didn't get a good answer from the testimony. I just have some observations. First, it came out, from looking at the case law, *285 and the statute, and the testimony, that underinsured motorist's coverage came into the picture, insofar as personal auto insurance is concerned, in 1984. So, when Mr. Pizzullo made the call to [the NJM customer service representative], it was only at most about two to three years later, and the insurance companies did not have a lot of practice with how the UIM coverage operated in a lot of different factual scenarios. It's not an excuse, I just want to note that to me it was a possible explanation.

I, also, my own conclusion was that some confusion may have resulted from the distinction between coverage per vehicle and coverage per person. That Dorothea Pizzullo's vehicle in some respects did get identical coverage to Michael's vehicle. They had the same liability limit per accident, and the same limit, $500,000 per accident. So, if each of them were driving their car on the same day, at the same time, and they were involved in separate accidents, each of them would get the per accident maximum of $500,000. An so in that sense, they did purchase the same coverage. And also, for liability, the per vehicle approach is easy to grasp. There's $500,000 for each car per accident.
[(Emphasis added).]
It seems clear to us from these observations, that the trial court viewed what occurred here as an act of simple negligence by NJM. Although we do not owe any special deference to the trial court's legal conclusion, Shaler v. Toms River Obstetrics & Gynecology Assocs., 383 N.J.Super. 650, 657, 893 A.2d 53 (App.Div.), certif. denied, 187 N.J. 82, 899 A.2d 304 (2006), we are nevertheless in agreement with its unstated, but clearly implied conclusion, that the evidence presented here only supports a finding of simple negligence. As the trial court noted, the coverage consequences flowing from NJM's protocol of discouraging plaintiffs from purchasing a separate policy covering only Dorothea's car were not readily apparent, even to highly experienced professional staffers.
The concept of UIM coverage was a developing one in 1988. It is not disputed that the customer service representative's advice to the Pizzullos was given in good faith. Although, in retrospect, it seems clear that a more prudent, better-reasoned analysis would have revealed the coverage implications between adding Dorothea's car to the existing family policy, and obtaining a separate policy in her name only, NJM's failure to comprehend this at the time amounts to nothing more than simple negligence. Under these circumstances, NJM is entitled to the immunity granted by N.J.S.A. 17:28-1.9a.
In light of the statute's clear standards for the imposition of liability, the trial court's reliance on the doctrine of equitable estoppel to sustain plaintiffs' cause of action cannot stand. We recognize that in Harr v. Allstate Insurance Co., 54 N.J. 287, 306-07, 255 A.2d 208 (1969), the Supreme Court held that
where an insurer or its agent misrepresents, even though innocently, the coverage of an insurance contract, or the exclusions therefrom, to an insured before or at the inception of the contract, and the insured reasonably relies thereupon to his ultimate detriment, the insurer is estopped to deny coverage after a loss on a risk or from a peril actually not covered by the terms of the policy. The proposition is one of elementary and simple justice. By justifiably relying on the insurer's superior knowledge, the insured has been prevented from procuring the desired coverage elsewhere.
We note, however, that Harr predates the passage of N.J.S.A. 17:28-1.9 by thirty-four *286 years. We are thus compelled to conclude that commencing on June 29, 1993, the Legislature has seen fit to derogate from this equitable doctrine, by requiring a more egregious standard of conduct before liability can attach to an insurance carrier. Stated differently, the equitable doctrine of estoppel can no longer be invoked to hold an insurance carrier liable under the circumstances presented here.
Reversed.
NOTES
[1] Ordinarily, we refer to adults by their last names. Because plaintiffs share the same last name, we will use their first names in the interest of clarity. We intend no disrespect by doing so.
[2] Plaintiffs did not cross-appeal this aspect of the trial court's ruling, which was not memorialized in the Order for Judgment.
[3] After articulating its factual findings, the trial court reserved a final determination pending additional briefing from the parties on two questions of law. The court rendered its final decision approximately one month later in a telephone conference-call with counsel.
[4] Although, in her testimony, Middleton could not recall any specific conversation she had with plaintiffs, NJM records reflect a conversation between Michael and Middleton that occurred on April 9, 1987. Dorothea's new car was added to Michael's policy after that date, effective April 14, 1987.
[5] Some time after this accident, NJM modified the language used in the declarations page to describe UIM coverage to emphasize that the limit of coverage is per accident. According to John Hart, Assistant Vice President of NJM, this change was not in response to this litigation.
[6] See N.J.S.A. 39:6A-23d, and N.J.A.C. 11:3-15.5(e)-(f), which require insurance carriers with at least two percent of New Jersey's private passenger automobile market, to provide a toll-free telephone number that an insured can use to obtain information about his or her policy, including questions about coverage or premiums.