952 A.2d 1077

MICHAEL PIZZULLO AND DOROTHEA PIZZULLO, H/W, PLAIN-TIFFS–APPELLANTS, v. NEW JERSEY MANUFACTURERS INSURANCE COMPANY, DEFENDANT–RESPONDENT.

Argued February 4, 2008—Decided August 7, 2008.

---

252

*Gerald R. Stockman,* argued the cause for appellants (*Kalavruzos, Mumola & Hartman,* attorneys; *Anthony J. Monaco,* on the brief).

*Kevin M. Shanahan,* argued the cause for respondent.

Justice HOENS delivered the opinion of the Court.

In this matter, we are called upon to determine the scope that our Legislature intended to be afforded to the statute enacted in June 1993, which granted automobile insurers immunity from suit arising from an insured's election of coverage. *See N.J.S.A.* 17:28–1.9(a). The trial court, after first concluding that the statute did not provide the insurer with immunity, determined that the insurer was equitably estopped to decline coverage. The Appellate Division reversed, finding that the statute afforded the insurer immunity and rejecting the application of the estoppel doctrine as having been abrogated by the passage of the immunity statute itself.

Our analysis of the intent and meaning of the statute compels us to conclude that, notwithstanding its apparently broad wording,

this record presents us factual circumstances that place the insurer outside of the statute's protective scope. The factual record, which is truly unique, demonstrates that the insured requested certain coverage and that the insurer promised to provide it, but did not do so. The record further reflects that the insurer misrepresented the coverage to the insured and that the documents issued to the insured were inherently ambiguous. In these unusual circumstances, we conclude that the insurer was not entitled to claim the immunity afforded by the statute. We further conclude that because of the ambiguity in the documents, the insured's expectation of coverage was reasonable.

I.

The facts are not a matter of controversy. In 1987, plaintiff Michael Pizzullo ("Michael") telephoned his automobile insurance carrier, defendant New Jersey Manufacturers Insurance Company ("NJM"), to obtain coverage for his wife, plaintiff Dorothea Pizzullo ("Dorothea"). The couple was purchasing a new car for Dorothea and, as part of their plan to establish a separate identity for his wife's credit and financial transactions, Michael wanted to acquire insurance coverage for her that was as good as the coverage that he then had for himself. He telephoned defendant and discussed his request with Linda Middleton, a customer service representative. He specifically asked to purchase a separate policy in his wife's name so that he could accomplish his goal of ensuring that she had the same protections that his policy afforded him.

It is undisputed that Michael had a history of asking for high levels of coverage, often seeking the maximum available policy limits. It was in keeping with his usual practice, therefore, to make a request for a similarly high level of protection when seeking coverage for his wife's new vehicle. In response to his inquiry, Middleton told Michael that it was not NJM's practice to write separate policies for married couples, but that he could accomplish "the same exact coverage" for her simply by adding

her new car to the existing policy. This advice was not only part of Middleton's regular response to such questions, but was also in compliance with her training. According to Michael's unrebutted testimony, he pressed Middleton, repeating his desire to establish credit for his wife and asking again for a separate policy. Defendant does not contest Michael's assertion that he was again assured that by adding Dorothea and her new vehicle to his existing policy, he would accomplish his goal of creating the same coverage for her as he had.

Defendant conceded that in 1987, when Michael made his request, it had a policy of discouraging the purchase of separate insurance policies by spouses, unless the couple was separated or divorced, and that it trained its customer service representatives to respond to any inquiries of this kind just as Middleton did when Michael asked about coverage for his wife. Because plaintiffs were a married couple who were not separated, Michael was not even told that it was possible for him to purchase the separate policy for his wife that he requested. Instead, he was assured that the single policy would cover each of them equally and to the same extent Michael was covered at the time.

Having been assured that by adding his wife to his existing policy he would be obtaining coverage for her that was equal to what he already had for himself, Michael acquiesced in Middleton's statement about the coverage. Defendant issued the policy in 1987 and sent the policy, along with a declarations page, a Buyer's Guide, and a Coverage Selection Form, to plaintiffs. Significantly, and in accordance with Michael's recollection, defendant charged separate premiums for his car and for his wife's car, the new total being approximately double the premium that he had been paying for the prior policy. The policy was renewed every year thereafter, and the same documents were sent each year. Each time, plaintiffs received a declarations page that showed $500,000 for liability coverage, per car, per accident; and $500,000 per car for Uninsured/Underinsured Motorist (UM/UIM) coverage. The declarations page did not contain an explicit

notation that the UM/UIM coverage was provided on a per accident basis. The policy document itself, however, contained a separate UM/UIM provision, stating that the UM/UIM benefits were provided on a per accident basis.

In actuality, the assurance given by defendant through its customer service representative was not accurate. Rather than providing the same level of coverage for each of the spouses, the effect of adding Dorothea to Michael's existing policy was to bring both of them within one $500,000 per accident coverage limit for UM/UIM purposes. The result was that, despite their newly doubled premium, plaintiffs' UM/UIM coverage limit was, potentially, only half of that for each of them in the event that they were both injured in a single accident. Had defendant answered Michael's question correctly, and had Michael been permitted to purchase a separate policy for his wife as he requested, each would have been able to obtain the maximum UM/UIM benefits of $500,000 to cover injuries suffered in a common accident. In the alternative, had NJM explained that coverage would essentially be halved in the event of a common accident, plaintiffs could have applied for liability and UM/UIM coverage of $1,000,000, which in fact was the maximum NJM offered at that time.

At trial, defendant's corporate representative conceded that failing to make clear the UM/UIM consequences of having one policy rather than two could be seen to be "a disservice to the customer." As such, the inaccurate answer given in response to a question like Michael's about the coverage deprived the customer of information needed to be able to make an informed choice about whether to add a new car to the existing policy or to purchase a separate policy for each spouse.

In 1998, plaintiffs were both severely injured when they were involved in a single accident while using the same vehicle, and they collected all of the available insurance from sources other than the policy issued by defendant. Believing that they each had $500,000 UIM coverage, the maximum amount allowed by their policy, they each sought the full benefit of that UIM limit.

Defendant denied that claim, asserting that the policy had a $500,000 per accident limit rather than a $500,000 per insured limit, with the result that this was the total amount that they could recover for their injuries.

## II.

Plaintiffs filed their declaratory judgment action in the Law Division seeking a determination that each of them was entitled to UM/UIM benefits up to $500,000. Defendant argued that even though the advice given to the insureds by defendant's customer service representative was erroneous, and even though plaintiffs had relied on that inaccurate representation when they agreed to forgo the purchase of a separate policy for Dorothea, defendant was nonetheless immune from liability. In particular, defendant argued that it was entitled to the protection of the immunity statute absent a showing that its acts were willful, wanton or grossly negligent. *See N.J.S.A.* 17:28-1.9(a).

### A.

Following a two-day bench trial, the trial court issued detailed findings of fact, followed by equally detailed conclusions of law. In particular, the court found that Michael had asked for a separate policy for his wife that would provide the same coverage that he had, that Middleton had told him that he could secure the same coverage for his wife by adding her to his policy, that he chose a joint policy based on this misrepresentation, and that the Pizzullos paid separate premium amounts for their coverage.

In addition, the trial court made findings relating to claimed ambiguities in the insurance materials defendant provided to plaintiffs. Specifically, the declarations page failed to include the words "Each Accident" in the column describing UIM coverage, the Buyer's Guide was unclear about the precise limit on UIM benefits, and the Coverage Selection Form did not contain any explicit indication that UIM benefits were afforded only on a per accident basis. At the same time, however, the trial court found

that the language in the insurance policy and the Endorsement was clear about the fact that the total UM/UIM coverage available for all family members was $500,000 per accident.

Regardless of whether or not the documents themselves were ambiguous, the trial court concluded that defendant was not entitled to statutory immunity as against plaintiffs' claims because it had made affirmative misrepresentations to plaintiffs in response to their questions about coverage. Emphasizing that the immunity statute, *N.J.S.A.* 17:28–1.9(a), was enacted to limit litigation over an insurer's failure to inform insureds of coverage options, the trial court reasoned that it only immunized insurers from claims premised on that type of failure. Because plaintiffs' claim was not based on defendant's failure to inform of coverage options, but rather on its misrepresentation about the option that it encouraged them to select, the trial court held that the statute did not apply.

Having determined that defendant was not entitled to the protection of the immunity statute, the trial court reasoned that defendant was equitably estopped to deny the coverage, citing *Harr v. Allstate Insurance Company*, 54 *N.J.* 287, 255 *A.*2d 208 (1969). The trial court reasoned that plaintiffs justifiably relied on Middleton's representation about double coverage, that in light of the ambiguity in the declarations page about the UIM coverage their reliance was reasonable, with the result that defendant should be estopped to deny plaintiffs the coverage they believed that they had both bargained for and secured. *See id.* at 306–07, 255 *A.*2d 208. Consequently, the court entered judgment in favor of plaintiffs and against defendant in the amount of $800,000, together with $75,060 representing pre-judgment interest.

### B.

Defendant appealed and the Appellate Division, in a published opinion, *Pizzullo v. N.J. Mfrs. Ins. Co.*, 391 *N.J.Super.* 113, 917 *A.*2d 276 (App.Div.2007), reversed. In short, the panel reasoned that defendant was entitled to the protection of the immunity

statute if it could satisfy that statute's specified criteria. *See*
*N.J.S.A.* 17:28–1.9. The Appellate Division reasoned that the
statute contained three requirements and it concluded that, based
upon its analysis of the undisputed facts, defendant met all of
them. *Pizzullo, supra,* 391 *N.J.Super.* at 118, 917 *A.*2d 276.
First, the panel noted that plaintiffs' UIM coverage was $500,000,
well in excess of the $35,000 minimum required by law, thus
satisfying the statute's requirement that the insurance policy
provide at least the minimum coverage required by law. *Ibid.*
(citing *N.J.S.A.* 17:28–1.9(a)). Second, the panel found that defen-
dant complied with the statute's notice requirements because it
provided the Pizzullos with the appropriate Coverage Selection
Forms, and obtained executed copies thereof, as required by
*N.J.S.A.* 17:28–1.9(b). *Pizzullo, supra,* 391 *N.J.Super.* at 118, 917
*A.*2d 276. Finally, the Appellate Division concluded that although
defendant's erroneous advice to Michael might well be regarded as
simple negligence, nothing in the record suggested that defendant
engaged in willful, wanton or grossly negligent conduct that would
deprive it of the protection of the immunity statute. *Id.* at 118,
127–28, 917 *A.*2d 276. In short, the appellate panel noted: "[P]ro-
viding erroneous information to [the Pizzullos] as to the scope of
their policy's UIM coverage, ten years before the accident that
triggered the policy's UIM provisions, does not rise to the level of
a willful, wanton, or grossly negligent act." *Id.* at 118, 917 *A.*2d
276.

Moreover, the Appellate Division rejected the trial court's es-
toppel analysis, reasoning that the immunity statute, *N.J.S.A.*
17:28–1.9, superseded this Court's earlier decision that an insur-
ance company could be estopped to deny coverage to an insured
who reasonably relied on the company's misrepresentation of
coverage. *Pizzullo, supra,* 391 *N.J.Super.* at 128, 917 *A.*2d 276
(citing *Harr, supra,* 54 *N.J.* at 306–07, 255 *A.*2d 208). The
Appellate Division noted that it was "compelled to conclude that
commencing on June 29, 1993 [the date of the enactment of the
immunity statute], the Legislature has seen fit to derogate from
[*Harr's*] equitable doctrine [and] requir[e] a more egregious stan-

dard of conduct before liability can attach to an insurance carrier." *Id.* at 128–29, 917 *A.*2d 276.

We granted plaintiffs' petition for certification, 192 *N.J.* 71, 926 *A.*2d 856 (2007), and we now reverse.

### III.

Plaintiffs argue that the Appellate Division improperly extended the scope of the immunity statute beyond claims included within its terms, that is, claims brought "on account of the election" of certain coverage, *N.J.S.A.* 17:28–1.9(a), to claims like theirs seeking to compel coverage that they specifically requested and that they were promised by defendant.

Plaintiffs point to the Appellate Division's earlier analysis of the immunity statute and its legislative history, *see Strube v. Traveler's Indem. Co.*, 277 *N.J.Super.* 236, 237, 649 *A.*2d 624 (App.Div. 1994), *aff'd o.b.*, 142 *N.J.* 570, 667 *A.*2d 188 (1995), as recognizing that its specific purpose is to protect insurers against claims that they had failed to advise their customers about available coverage. They argue that because their claim is not based on defendant's failure to inform them of available coverage but on the insurer's affirmative misrepresentation to them, the Appellate Division extended the statute's scope far beyond its intended purpose and created immunity for an insurer's admittedly affirmative misrepresentations of a kind that the Legislature did not consider.

In contrast, defendant argues that the Appellate Division properly analyzed and applied the immunity statute. In particular, defendant asserts that plaintiffs' claim is based on the "election of a given level of motor vehicle insurance coverage" because in deciding to add Dorothea to the existing policy, the Pizzullos "elected" coverage, and that in doing so, they elected a joint auto insurance policy that provides $500,000 in UIM coverage per accident. In defendant's view, this constitutes an election of coverage just like any other and falls squarely within the statute's intended scope.

Defendant also argues that, because it is a direct-writing insurer and does not employ brokers or agents, it had no duty to plaintiffs other than to comply with the statutory notification requirements, *see N.J.S.A.* 17:28–1 to –8; *N.J.S.A.* 39:6A–23. Relying on *Andriani v. New Jersey Manufacturers Insurance Company,* 245 *N.J.Super.* 252, 256–57, 584 *A.*2d 875 (App.Div.), *certif. denied,* 126 *N.J.* 327, 598 *A.*2d 886 (1991), defendant asserts that its customer service representatives are neither agents nor brokers, because they do not offer recommendations or advice about insurance needs, give counsel to the insureds, sell policies or suggest increases or decreases to coverage. Rather, because the sole purpose of the customer service representatives is "to answer inquiries and incidentally update records," defendant asserts that they do not have the same duty to inform and advise insureds as insurance agents and brokers have. Therefore, regardless of what its customer service representative said to plaintiffs, defendant argues that it is entitled to immunity because it mailed plaintiffs the Buyer's Guides and Coverage Selection Forms required by the statute. *See N.J.S.A.* 17:28–1.9(b); *N.J.S.A.* 39:6A–23; *see also Andriani, supra,* 245 *N.J.Super.* at 256, 584 *A.*2d 875.

Moreover, defendant argues that the Appellate Division correctly rejected the trial court's equitable estoppel analysis. In so contending, defendant urges us to conclude, as did the appellate panel, that the trial court's reliance on *Harr, supra,* 54 *N.J.* at 306–07, 255 *A.*2d 208, was misplaced, and that plaintiffs' reliance on the conversation with Middleton was so unreasonable, in light of the general nature of the conversation and the "vague, nonspecific representation" Middleton made about double coverage, that it cannot support imposition of equitable estoppel.

## IV.

Our analysis requires that we first consider the meaning and intent of our Legislature in enacting the statute that is at the heart of this dispute. In any matter requiring our consideration of a statute, our essential task is to understand and give effect to

the intent of the Legislature. *See Roberts v. State, Div. of State Police,* 191 *N.J.* 516, 521, 924 *A.*2d 550 (2007) (construing meaning of police disciplinary statute through use of extrinsic aids); *Bunk v. Port Auth. of N.Y. & N.J.,* 144 *N.J.* 176, 194, 676 *A.*2d 118 (1996) (construing intent of Legislature's amendment to Workers' Compensation Act). In doing so, we look first to the plain language of the statute, seeking further guidance only to the extent that the Legislature's intent cannot be derived from the words that it has chosen. *Roberts, supra,* 191 *N.J.* at 521, 924 *A.*2d 550. In the event that the language is not clear and unambiguous on its face, we look to other interpretive aids to assist us in our understanding of the Legislature's will. *See, e.g., ibid.* (reviewing extrinsic aids including Governor's conditional veto message and sponsors' statements); *Panzino v. Cont'l Can Co.,* 71 *N.J.* 298, 301–03, 364 *A.*2d 1043 (1976) (relying on sponsor's statement for guidance).

The statute provides an insurer with immunity from suit "in an action for damages on account of the election of a given level of motor vehicle insurance coverage. . . ." *N.J.S.A.* 17:28–1.9(a). As the Appellate Division recognized, there are three prerequisites to the application of the statute, but none of them is the focus of plaintiffs' argument. Rather, plaintiffs assert that, based on the language of the statute, it does not apply to their particular circumstances. They point out that they are not suing their insurer "on account of the election of a given level of . . . coverage" as that phrase is used in the statute or as it was meant by the Legislature. Instead, plaintiffs contend that they made no election of coverage in the sense intended by the statute, which implies that they were presented with choices about available coverage levels and selected from among them. Plaintiffs claim that asking for precisely what they wanted and being assured, incorrectly, that they had received it, simply does not involve an election as contemplated by the statute's wording. Our analysis of this argument cannot be based on the words used by the Legislature alone, because as this dispute illustrates, the language cho-

sen, that is, use of the word "election," is not, at least in this situation, clear.

Instead, the argument before the Court requires that we consider the Legislature's intent by attempting to understand the immunity statute in the context of the history of UM/UIM coverage. Prior to 1972, UM coverage was entirely optional. *See L.* 1968, *c.* 385, § 3. Beginning in 1972, it was no longer optional and automobile insurers were required to offer $30,000 in UM coverage. *See L.* 1972, *c.* 204. After the enactment of the New Jersey Automobile Freedom of Choice and Cost Containment Act of 1984 (the 1984 Act), in October 1983, however, the newly-recognized UIM coverage also became mandatory and $30,000 became the minimum amount of UM/UIM coverage that was required of all insureds. *See L.* 1983, *c.* 362, § 2 (codified at *N.J.S.A.* 17:28–1.1(a)(2)). In addition, starting in 1984, automobile insurers were required to offer insureds up to $500,000 in UM/UIM coverage, depending on the limits of the liability coverage that the particular insured carried. *Ibid.* (codified at *N.J.S.A.* 17:28–1.1(b)).

At the same time, as part of the 1984 Act, the Legislature adopted notification guidelines so as to ensure that policyholders were informed about all options, including both the minimum UIM coverage requirement and the expanded UIM coverage options. *L.* 1983, *c.* 362, § 17 (codified at *N.J.S.A.* 39:6A–23). The statute required insurers to provide insureds with written notice that outlined the available coverage options, as well as with a Buyer's Guide to help insureds understand their automobile insurance policies. *Ibid.* Subsequent amendments adopted the term "Coverage Selection Form," *see L.* 1985, *c.* 520, § 5, and deemed it, if properly executed, to be "prima facie evidence of the named insured's knowing election or rejection of any option." *See L.* 1988, *c.* 119, § 35 (codified at *N.J.S.A.* 39:6A–23(e)).

After the enactment of the 1984 Act and the adoption of its guidelines, courts were clogged with claims by insureds "that they received improper or insufficient advice from insurance agents or brokers concerning the options available to them." *Strube, supra,*

277 *N.J.Super.* at 241, 649 *A.*2d 624. In a series of decisions responding to those complaints, this Court, and the Appellate Division, held that insurance agents and brokers had a duty to exercise reasonable skill and good faith in advising their customers about UIM coverage and about their coverage selection options. *See Weinisch v. Sawyer,* 123 *N.J.* 333, 340, 587 *A.*2d 615 (1991); *see also Avery v. Arthur E. Armitage Agency,* 242 *N.J.Super.* 293, 301–02, 576 *A.*2d 907 (App.Div.1990) (discussing various initiating inquiries by insured that might trigger duty to provide advice concerning availability of additional UIM coverage options); *Pinto v. Garretson,* 237 *N.J.Super.* 444, 449–50, 568 *A.*2d 119 (App.Div.1989) (holding insurance company that sent Coverage Selection Form and Buyer's Guide had no further duty to communicate directly with insured to advise of importance of notice or recommend purchase of additional coverage); *Sobotor v. Prudential Prop. & Cas. Ins. Co.,* 200 *N.J.Super.* 333, 337–42, 491 *A.*2d 737 (App.Div.1984) (finding liability for failure to provide optional UIM coverage for insured who had requested "best available" automobile insurance package).

■ In 1993, the Legislature passed the immunity statute, *N.J.S.A.* 17:28–1.9 (the 1993 Act), in direct response to this flood of litigation. As the Appellate Division has previously noted, this statute "was intended to put an immediate end to this explosion of litigation by providing blanket immunity except in cases of willful, wanton, or gross negligence." *Strube, supra,* 277 *N.J.Super.* at 242, 649 *A.*2d 624. In short, the statutory immunity was enacted to abrogate the duty imposed on insurers, insurance agents, and brokers by earlier judicial decisions making them "liable for failing to advise their customers of the availability of additional underinsured and uninsured motorist coverage." *Id.* at 237, 649 *A.*2d 624.

The available legislative history supports this understanding. The Sponsor's Statement that accompanied the bill when it was introduced contained the following description:

This bill provides immunity from liability to insurers ... and producers (agents and brokers) if a named insured does not elect higher limits of insurance coverage

than required by New Jersey's motor vehicle insurance laws or if a named insured does not elect to purchase underinsured motorist coverage, collision coverage or comprehensive coverage.

[Sponsor's Statement, *Statement to Senate Bill No. 804* (May 14, 1992).]

In its Statement to the Senate, the Senate Commerce Committee described the statute in similar terms:

*This bill provides immunity to insurers ... from any liability arising from a named insured not electing higher limits of insurance coverage than required by New Jersey's motor vehicle insurance laws* or not purchasing underinsured motorist coverage, collision coverage or comprehensive coverage. However, this immunity would not apply to any person causing damage as the result of his willful, wanton or grossly negligent act of commission or omission.

[Senate Commerce Committee, *Statement to Senate Bill No. 804* (June 8, 1992)(emphasis added).]

Assemblywoman Clare Farragher (R–Monmouth), one of the sponsors of the companion bill introduced in the Assembly, *see* Assembly Bill No. 1437, described the rationale behind the statute as follows:

This law is another step in the process to make people responsible for their own actions and decisions ... If a driver, in an effort to save money on his auto insurance policy, elects to carry only the basic minimum coverage, then that driver cannot come back at some later point and sue.

[Ivette Mendez, *Expanded grandparent visitation, sentencing guides signed into law, Star Ledger,* June 30, 1992.]

The intent of the Legislature, therefore, is clear; it responded to a flood of claims by insureds who had chosen the minimum available UIM coverage, in spite of having been advised of their options and the consequences of their choice, and who thereafter sought to shift the blame for what they later decided was inadequate coverage by claiming that the insurer, or its representatives, should have caused the insured to make a different choice. In that context, the inclusion of the exception to immunity based on "willful, wanton or gross negligence" created an important safety valve for purchasers of insurance in those few situations in which the loss should appropriately fall on the insurer.

As initially introduced, the bill that would eventually become the immunity statute included only subsection (a), that is, the grant of immunity itself. The second subsection, (b), which was added

during the review of the bill by the Senate Commerce Committee, included a new requirement that would be a condition of the grant of immunity. Although, since the adoption of the 1984 Act and its intervening amendments, automobile insurers had already been required to provide their insureds with both a Coverage Selection Form and a Buyer's Guide, *see N.J.S.A.* 39:6A–23, subsection (b) of the 1993 Act added a further requirement. In order to gain the benefit of the statutory immunity, the insurer was required to secure an acknowledgément by the insured both that the available UM and UIM coverage limits had been explained and that the insurer would not be liable based on the insured's selection of coverage in accordance with subsection (a) of the immunity statute. *N.J.S.A.* 17:28–1.9(b).

■ Far, then, from the sort of blanket immunity that reaches well beyond the circumstances that gave rise to this legislative response, this legislative history denotes a careful and reasoned consideration of an appropriate solution to a then-overwhelming problem posed by the litigation explosion and the efforts by the courts to find the balance between the competing interests of insurers and those who purchase insurance. Seen in its historical context, therefore, we conclude that the Legislature meant the statute to confer immunity in circumstances relating to an insured's election of UIM coverage when the insured attempts to later shift the blame for a decision to opt for any level of coverage less than the maximum back onto the insurer, as long as the insurer has complied with its obligations to make known the availability of all possible limits as required by the statute.

The circumstances we here confront, however, are unlike those that the Legislature addressed in responding to the litigation explosion. Unlike the insureds who pursued those claims, Michael had a long history of seeking the highest coverage options, rather than anything less. At the time of Michael's telephone call, plaintiffs were seeking coverage only in the context of their effort to establish a credit history for Dorothea, and Michael specifically asked for separate coverage for his wife's vehicle that would

maximize the protection that the coverage would afford her. Unlike the insured who, in an effort to save premium dollars, chooses a lower limit of coverage and then complains when it is inadequate, these plaintiffs actively pursued their goal of maximizing their protection. But for the inaccurate responses to Michael's questions by the representative employed by defendant, plaintiffs would have had the coverage they asked for.

We see in the statute, and in the legislative history, nothing that suggests that the Legislature intended to extend its immunity to these unique facts. In fact, the use by the Legislature of the phrase "election of a given level of ... coverage" confirms our analysis, because we understand the term "election" to have been used in accordance with its precise meaning. 2A Norman J. Singer, *Sutherland Statutory Construction* §§ 47:29, 47:30 (6th ed. 2000); *N.J.S.A.* 1:1–1 (declaring that "words and phrases having a special or accepted meaning in the law, shall be construed in accordance with [that] ... meaning."). An "election" is, simply put, a choice made as among options that are presented. *See Black's Law Dictionary* 557 (8th ed. 2004). When the Legislature created the immunity, it was coupled with the obligation of the insurer to demonstrate that it had complied with its statutory duty to inform its insureds of the choices available, *N.J.S.A.* 17:28–1.9(b). That duty, in turn, may be discharged by providing the insureds with a Buyer's Guide that contains a "description of all available policy coverages and benefit limits ... as well as all options offered by the insurer." *N.J.S.A.* 39:6A–23(a). The intent, therefore, was to grant the insurer immunity when an insured, having been made aware of his or her options, chose, that is, elected, among them. The intention was to protect the insurer from a subsequent claim by such an insured to the effect that he or she should have made, or should have been counseled to make, a different choice, that is, one that would have afforded a higher level of coverage. That, however, is not at all what happened here, because this insured asked for precisely the level of coverage he wanted, was promised that coverage, and simply seeks to hold

the insurer to that agreement. To the extent that Michael elected, he seeks only to enforce that choice, not, as the statute would prohibit, to avoid it.

Even if we were not persuaded that our reading and understanding of the scope of the immunity statute is fully consistent with the Legislature's intent, we would nonetheless find no ground on which to impose a bar against plaintiffs' recovery here. We reach this conclusion based on the application of fundamental principles that govern our analysis of insurance policies.

As we have long recognized, insurance policies are contracts of adhesion "between parties who are not equally situated." *Meier v. N.J. Life Ins. Co.*, 101 *N.J.* 597, 611, 503 *A.*2d 862 (1986) (citing *Allen v. Metro. Life Ins. Co.*, 44 *N.J.* 294, 208 *A.*2d 638 (1965)). An insurance company is "expert in its field and its varied and complex instruments are prepared by it unilaterally whereas the assured or prospective assured is a layman unversed in insurance provisions and practices." *Gibson v. Callaghan*, 158 *N.J.* 662, 669, 730 *A.*2d 1278 (1999) (quoting *Allen, supra,* 44 *N.J.* at 305, 208 *A.*2d 638). Because of the substantial disparity in the sophistication of the parties, and because of the highly technical nature of insurance policies, we have long "assume[d] a particularly vigilant role in ensuring their conformity to public policy and principles of fairness." *Id.* at 669–70, 730 *A.*2d 1278 (quoting *Voorhees v. Preferred Mut. Ins. Co.*, 128 *N.J.* 165, 175, 607 *A.*2d 1255 (1992)).

In interpreting insurance contracts, we first examine the plain language of the policy and, if the terms are clear, they "are to be given their plain, ordinary meaning." *Zacarias v. Allstate Ins. Co.*, 168 *N.J.* 590, 595, 775 *A.*2d 1262 (2001). In doing so, we have recognized that "courts should interpret the policy as written and avoid writing a better insurance policy than the one purchased." *President v. Jenkins*, 180 *N.J.* 550, 562, 853 *A.*2d 247 (2004) (citing *Gibson, supra,* 158 *N.J.* at 670, 730 *A.*2d 1278). However, "[w]hen there is ambiguity in an insurance contract, courts interpret the contract to comport with the reason-

able expectations of the insured, even if a close reading of the written text reveals a contrary meaning." *Zacarias, supra,* 168 *N.J.* at 595, 775 *A.*2d 1262 (citing *Gibson, supra,* 158 *N.J.* at 671, 730 *A.*2d 1278). Indeed, in some circumstances, we have recognized that it might be appropriate to permit an insured's reasonable expectation to overcome the plain meaning of a policy. *Voorhees, supra,* 128 *N.J.* at 175, 607 *A.*2d 1255 (citing *Werner Indus. v. First State Ins. Co.,* 112 *N.J.* 30, 35–36, 548 *A.*2d 188 (1988)).

 Applying this analysis to the undisputed facts leads us to conclude that the ambiguities evident in the documents that defendant provided to plaintiffs, coupled with the inaccurate representation about the coverage made by defendant through its customer service representative in response to Michael's request for a separate policy, created a reasonable expectation that he had in fact secured the double coverage that he sought. As the trial court pointed out, even though the policy itself is clear in its language applying a per accident limitation to the UIM coverage, prior to the date of their accident, the declarations pages plaintiffs received omitted that important aspect of the coverages afforded to these insureds, implying that they had received the protection for which they had bargained.

In particular, the declarations sheet pointed out, accurately, that the maximum liability coverage was $500,000 and it specified, in a different typeface, that this limitation applied to "Each Accident." In a column identifying the UM/UIM coverage on the same page, the coverage was simply identified as being $500,000 without any suggestion that the limit was also intended to apply per accident. On its face, then, the declarations page appeared to limit only liability and not UM/UIM coverage. As such, it created an ambiguity as to the coverage that they actually had that was not, in fact, resolved. *See Zacarias, supra,* 168 *N.J.* at 602–03, 775 *A.*2d 1262; *Gerhardt v. Cont'l Ins. Cos.,* 48 *N.J.* 291, 298, 225 *A.*2d 328 (1966).

Similarly, the Buyer's Guide and Coverage Selection Form were, in this context, ambiguous. The Buyer's Guide referred to the UM/UIM limits, setting forth that the maximum available was $500,000. However, because that language also included a statement that a particular insured might want to seek additional coverage to benefit family members, it would not have been entirely clear to plaintiffs that they were not each separately eligible for that entire amount. We perceive a like ambiguity in. our analysis of the Coverage Selection Form, which, beginning in 1990, included a statement that the insurer "does not offer $1,000,000" UM/UIM coverage. In light of the conversation with Middleton, plaintiffs might have understood that to mean that the policy would provide coverage to each of the named insureds in the policy only up to the $500,000 limit, but that it would offer that amount to each of them individually. For purposes of our analysis, Middleton's status as a customer service representative, rather than an agent or broker, *see Andriani, supra,* 245 *N.J.Super.* at 255–57, 584 *A.*2d 875, is not relevant because we do not here address a claimed breach of a duty to give advice about coverage. In addition, even though a careful and searching review of the policy itself would have disclosed that the per accident limitation applied with equal force to the UIM coverage, in these unique circumstances, it could not have overcome the ambiguity on the face of the declarations sheet.

We have previously recognized the important role that declarations sheets play in informing an insured about the parameters of insurance coverage. *Zacarias, supra,* 168 *N.J.* at 602, 775 *A.*2d 1262. As we have observed, "the one page most likely to be read and understood by the insured is the declarations sheet. Insurers are well advised to explore ways to incorporate as much information as may be reasonably included in the declarations sheet." *Zacarias, supra,* 168 *N.J.* at 603–04, 775 *A.*2d 1262. As a result, in some circumstances, the failure to identify a relevant exclusion on the declarations page may contribute to the creation of an ambiguity in an otherwise clear policy of insurance. *Id.* at

602, 775 A.2d 1262 (citing *Gerhardt, supra,* 48 *N.J.* at 298, 225 A.2d 328).

A finding of ambiguity in plaintiffs' declarations sheet is bolstered by the concession at trial by David Hart, one of NJM's Vice Presidents, that one of the reasons defendant altered the declarations sheet in 2000 was to clarify that *both* liability and UIM coverage were limited to a per accident basis. That redesign of the declarations sheet was originally undertaken to comply with then-recent statutory amendments, *see N.J.S.A.* 39:6A–1.1, and resulted in placing the liability and UIM columns next to one another. At trial, Hart conceded that, after making that change, he realized that "for consistency sake" the UIM column should also contain the "Each Accident" notation. Given that defendant recognized the potential inconsistency resulting from two identically limited coverage options having different notations, it was certainly reasonable for plaintiffs to believe that their UIM coverage was not limited to a per accident basis.

Although we do not intend to imply that insureds are relieved of their ordinary duty to review, and to be bound by the terms of, the policy itself, *see, e.g., Eason v. NJAFIUA,* 274 *N.J.Super.* 364, 376–77, 644 A.2d 142 (App.Div.1994), *certif. denied,* 140 *N.J.* 327, 658 A.2d 726 (1995), in these unique circumstances, even a close, searching review would not have resolved the ambiguity.

Here, having specifically asked for a separate policy for Dorothea that would give Dorothea the same coverage that Michael had, and having been assured that by adding Dorothea to the existing policy, each of the spouses would have the same coverage that Michael had preceding Dorothea's addition to the policy, the declarations page that plaintiffs received immediately thereafter did not dispel the inaccurate advice that he had been given. Under these circumstances, and in light of the great importance of the declarations page in determining the reasonable expectations of an insured, *see Lehrhoff v. Aetna Cas. & Sur. Co.,* 271 *N.J.Super.* 340, 346–47, 638 A.2d 889 (1994), we conclude both that the policy documents were ambiguous and that it was reasonable for

plaintiffs to believe that they had secured the "double coverage" that they thought they had been promised. *See Charles Beseler Co. v. O'Gorman & Young, Inc.,* 188 *N.J.* 542, 545–46, 911 *A.*2d 47 (2006). In light of our analysis of the scope of the statute, we need not address the trial court's alternate equitable estoppel analysis or the Appellate Division's rejection thereof.

## V.

The judgment of the Appellate Division is reversed and the judgment of the Law Division in favor of plaintiffs and against defendant is reinstated.

*For reversal and reinstatement*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA-SOTTO and HOENS—7.

*Opposed*—None.