**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5505-14T1

PAUL J. BANACH and APRIL
BANACH,

    Plaintiffs-Appellants,

v.

ALEX TARAKANOV and ELENA
TARAKANOV,

    Defendants,

and

NEW JERSEY MANUFACTURERS
INSURANCE COMPANY,

    Defendant-Respondent.
_____

        Argued May 18, 2017 — Decided September 12, 2017

        Before Judges Hoffman, O'Connor and Whipple.

        On appeal from Superior Court of New Jersey,
        Law Division, Bergen County, Docket No. L-
        6238-13.

        Barry D. Epstein argued the cause for
        appellants (The Epstein Law Firm, PA,
        attorneys; Mr. Epstein, of counsel and on the
        brief; Michael A. Rabasca, on the brief).

David T. Robertson argued the cause for respondent (Harwood Lloyd, LLC, attorneys; Mr. Robertson, of counsel and on the brief).

PER CURIAM

Plaintiffs Paul and April Banach[1] filed suit against defendant New Jersey Manufacturers Insurance Company (NJM) asserting claims of negligence, gross negligence, and willful misconduct relating to inadequate underinsured motorist (UIM)[2] coverage in their commercial automobile insurance policy. Plaintiffs now appeal from two Law Division orders: the first denied their motion to amend their complaint, and the second granted NJM's motion for summary judgment, dismissing their complaint.

In denying plaintiffs' motion to amend their complaint, the Law Division concluded the "purported amendment . . . would be futile" and also "prejudicial" to NJM. From our review, the record does not support these conclusions. We therefore reverse the order denying plaintiffs leave to amend their complaint.

In considering NJM's summary judgment motion, the Law Division refused to consider the report of plaintiffs' expert, concluding it constituted a net opinion. Plaintiffs' expert based

---

[1] For ease of reference, we refer to plaintiffs by their first names. We do not intend any disrespect by this informality.

[2] According to NJM's Commercial Auto Insurance Buyer's Guide, uninsured motorist (UM) and UIM coverages are "sold together." Frequently, the combined coverage is referred to as UM/UIM coverage.

A-5505-14T1

his opinions upon his extensive experience in New Jersey's insurance market and its regulation, after reviewing all relevant parts of the record. Following our review of the expert's report, we reject the trial court's conclusion that plaintiff's expert offered a net opinion. The judge further concluded that plaintiffs' claim against NJM is barred by N.J.S.A. 17:28-1.9. Because the record reveals factual questions whether NJM satisfied the criteria to benefit from the immunity provided by this statute, we reverse the trial court's grant of summary judgment and remand for trial.

I.

Viewing the record in the light most favorable to plaintiffs as the non-moving parties, see Angland v. Mountain Creek Resort, Inc., 213 N.J. 573, 577 (2013), we discern the following facts. On May 27, 2013, Paul sustained serious bodily injuries while operating his motorcycle in Paramus. The accident occurred when defendant Elena Tarakanov, while driving a car owned by her husband, defendant Alex Tarakanov, made an improper left-hand turn in front of Paul. IFA Insurance Company insured the Tarakanov vehicle, providing $100,000 of bodily injury liability coverage. Plaintiffs ultimately settled with the Tarakanovs for their $100,000 policy limit. Foremost Insurance Company insured Paul's

motorcycle; however, the policy included only liability and collision coverage.

On January 21, 2000, NJM issued a business auto policy to plaintiffs' newly formed company, Paul Banach Construction LLC (Banach Construction). The policy provided $500,000 of liability coverage but only $100,000 of UM/UIM coverage.

April handled the insurance for Banach Construction. Before purchasing the policy from NJM, which does not have brokers or agents, April spoke with one of its representatives on the telephone. According to April, "I asked them to just let me know what I had to have. I went by their guidance[,]" and "[I] asked them what would be my benefit to have." Referring to NJM's coverage selection form[3] (CSF), April said,

> Basically they went over it and told me just to sign my name and fax it[,] and they would do the rest.
>
> . . . .
>
> After . . . a discussion[,] they advised me that they would put what I needed.
>
> . . . .
>
> I didn't really understand any of the document[,] I'm embarrassed to say. . . . I wanted somebody to guide me[,] and I was with them since I was 17. I wanted them to guide me. I guess I was wrong.

---

[3] The form is labeled, "COMMERCIAL AUTO COVERAGE SELECTION FORM."

At the end of the phone call, April followed the instructions she received and signed the CSF in blank, before faxing the form to NJM. At her deposition, she confirmed the coverage selections on the form "aren't my markings[,]" expressing certainty because "I don't do this x swirly thing."

The completed CSF selected $500,000 for liability coverage but only $100,000 for UM/UIM coverage. The form also reflected selection of the "No Limitation on Lawsuit Option," above a paragraph that stated this selection will result in a higher liability premium. Thereafter, NJM issued a policy that included these coverages.

According to April, "in the years following[,] I would call, ask if there were any changes I should know about, anything that I should choose differently[,] and they would tell me to just write no changes across the top[,] which is what I would always do."[4] In January 2011, April contacted NJM to add a vehicle to their policy and spoke with NJM representative Ryan Ennis.[5] After

---

[4]    The record indicates recordings of at least some of these conversations are still available; however, the record only contains the transcript of a January 6, 2011 conversation.

[5]    At his deposition, Stanley Brzezinski, NJM's commercial lines underwriting manager, described Ennis as a "call center rep." All NJM call center reps hold a New Jersey insurance producer's license.

obtaining the information regarding the additional vehicle, Ennis

initiated the following colloquy with April:

> Q: Alright. I will put that on there for you. Now do you have your own . . . personal auto policy or is this your only policy in the household?
>
> A: This is it.
>
> Q: This is it. OK . . . because what I would suggest adding, since you don't currently have a personal auto policy in your household . . . there's no coverage for yourself or . . . for your husband for . . . personal injury protection in case you were to . . . borrow anyone's vehicle or be a passenger in someone else's vehicle.
>
> A: Hmm.
>
> Q: What we can offer is an endorsement to the policy which adds that coverage . . . 'cause that way you would have . . . protection for yourself, personal injury for no matter where you're at . . . whoever's vehicle you're in, whether it be a passenger or borrowing a vehicle, . . . you would have that coverage.
>
> Q: How much is that?
>
> A: Well, it depends on the . . . options that you choose[;] it could be as low as about $100 or up to about $200 depending on different options that you . . . .
>
> Q: A month?
>
> A: Uh, no, that's per year.
>
> Q: Oh.

A: It's not, not much money, you know, more[,] and it does give you . . . a benefit that way since you don't have a personal policy, it protects you, you know, for personal injury . . . as far as it can go.

Q: Um. OK. Yeah, I definitely need to look into that, well, especially with that cost, I mean, it's really not much of a difference . . .

A: Yeah.

Q: . . . broken down.

    . . . .

A: It's taking me so long to fill out this form. There's so many questions.

Q: I know . . . I know.

A: Because I am a generally like a person . . . who doesn't, isn't an insurance broker or anything, it's really hard to understand most of it.

Q: Yeah . . . yeah. Well, I mean, what I can do with you here, if you have a minute, I can . . . go over the price of what the difference would be for . . . selecting the options and, recommend . . . what you would want from these.

Ennis proceeded to "suggest" that April increase the medical expense limit on plaintiffs' policy from $250,000 to $1 million, with a $250 deductible (the minimum deductible permitted by law). April accepted his suggestion. Ennis then agreed to fax the coverage selection form to April, telling her "you need to check

off everything that we just discussed. So what I'll do is I'll put an arrow next to . . . the options that I just chose for you." April complied, checking off the coverages selected by Ennis and faxing the form back to him.

According to Brzezinski, from the time defendant issued its first policy to plaintiffs in 2000, to the time of Paul's accident, NJM had a "practice and procedure" of including "a coverage selection form (CSF) and a Buyer's Guide," as required by law, with every application for a business auto insurance policy, and each and every renewal. Although Brzezinski said NJM did not have a practice or policy of aligning an insured's liability coverage with the insured's UM/UIM coverage, he admitted he did not know the industry standard outside of NJM. When asked if he was "aware of any statistic at NJM of the percentage of policies that do not match liability with UM[-]UIM," he responded, "It's low."

Additionally, Brzezinski was asked about April's testimony, "that she was told to sign [the CSF] and send it back and the representative would fill in the coverage and place the check marks for the applicable coverage." Plaintiff's counsel then inquired, "Is that the way it's supposed to go? Is that proper procedure?" Brzezinski responded, "It's backward."

In August 2013, plaintiffs filed their complaint seeking damages from Tarakanov, alleging she negligently caused the

accident. Thereafter, plaintiffs filed an amended complaint adding NJM as a defendant, alleging NJM "seriously and flagrantly failed to meet its obligations to plaintiff, including its obligation to properly advise plaintiff of coverages, the effect of coverages, the inadequacy of coverages, has given misinformation and has otherwise failed to properly furnish information of proper insurance coverages in its dealing with plaintiff." Plaintiffs further alleged NJM's conduct "represents negligence, gross negligence, willful and wanton conduct and malice as a matter of law."

After receiving discovery, plaintiff obtained an expert report from Armando M. Castellini. According to his certified biography, Castellini has been a technical consultant and expert witness to attorneys in insurance matters and litigation involving approximately 1700 cases in twenty-four states.[6]

---

[6] Castellini's biography further states he previously served in various positions within the insurance industry, including: president of the Independent Insurance Agents of New Jersey; the New Jersey Insurance Commissioner's agent representative to the governing committee of the Automobile Insurance Plan; member of the committees involved in the drafting, enactment, and implementation of the New Jersey No-Fault Law; vice-president of the Insurance Broker's Association of New Jersey; member of the New Jersey Department of Insurance Task Force on Banking and Insurance; Member of the New Jersey Automobile Full Insurance Underwriting Association's Rules and Forms Committee; member of the New Jersey Department of Insurance Commissioner's Producer Advisory Committee; director of the New Jersey Association of Insurance Licensing Schools.

Before issuing his report, Castellini reviewed voluminous records, including "[a]pproximately 700 pages of documents produced by [defendant] consisting of [c]overage [s]election [f]orms and policy declaration pages."

According to Castellini,

> Because insurance companies believed they could not "under-write" the exposures presented by UM and UIM coverages, they generally tended to be adverse to selling the coverages, and the statutory change that made it the insured's option to purchase increased limits of UM/UIM when prior to this it had been the insurer's option to sell increase[d] limits was not well received by most insurance companies. An . . . example of this reaction is found in [NJM's memo from around January 1974]. These memos from management to personnel of carriers were clearly intended to avoid the application of the statutory change, and a direction to not "sell" increased limits of UM/UIM — unless an insured was wise enough to understand the coverage, its availability, and the serious nature of the exposure they faced absent the coverages.

Castellini attached a copy of the January 1974 NJM memo to his report.[7] Addressed to "SALES, CLAIMS & UNDERWRITING PERSONNEL," the memo stated, in relevant part:

> . . . Insureds may now purchase high limits of coverage to protect themselves more fully against damage or injury by an uninsured motorist and by so doing, automatically receive an extension of their coverage to

---

[7] At his deposition, Brzezinski stated the individuals listed on the memo "were attorneys with [NJM] and the president of the company."

10                                                    A-5505-14T1

> include Under-insured Motorist Coverage as well.
>
> . . . .
>
> At present[,] it is not our intent to actively market this new form of coverage. You nevertheless should be aware of its existence and the fact that on an insured's request, we will provide it.

Castellini cited "the introduction of the Basic Auto Policy . . . and the Special Auto Policy" as explaining "why the very large majority [of] Insurance Producers have developed the practice of recommending high limits of liability coverage so that their clients may then procure up to those high limits for their protection against [u]ninsured and [u]nderinsured drivers or vehicles."

Castellini further opined, "[I]n today[']s insurance environment in New Jersey, it is very rare to find a [p]ersonal or [c]ommercial [a]uto policy that does not have UM/UIM limits that match the policy's liability limits — and when that occurs, it is deemed to be violative of [industry] standards and practices."  He therefore concluded, NJM

> failed to conform to the generally accepted standards and practices relative to the matching of an insured's UM/UIM limits to the policy's liability limits; arbitrarily and capriciously established is own internal processes and procedures with regard to UM/UIM sales and limits; and did so intentionally and willfully; in violation of the statute as well as the industry practice.

He further noted, "A very minimal increase in the UM/UIM premium would have been charged for the increase from $100,000 to $500,000."

In December 2014, NJM filed a motion for summary judgment. The trial court heard oral argument on January 23, 2015, and reserved decision.

Plaintiffs then filed their motion to amend their complaint, seeking to include an allegation that NJM violated the New Jersey Consumer Fraud Act[8] (CFA). Following oral argument on May 29, 2015, a different judge denied plaintiffs' motion. He first noted that in Myska v. New Jersey Manufacturers Insurance Company, 440 N.J. Super. 458, 485 (App. Div. 2015), appeal dismissed as improvidently granted, 224 N.J. 523, 524 (2016), this court held, "[T]he CFA is not appropriate where a regulatory scheme deals specifically, concretely, and pervasively with a particular activity implying a legislative intent not to subject parties to multiple regulations that as applied will work at cross purposes." He then concluded,

> We now have a regulatory system where a party is entitled to purchase what they call insurance which is a basic policy which gives people recovery for property damage of $5,000 and medical bills for $10,000 and provides no liability insurance. People buy those policies. They get sued. They think they

---

[8] N.J.S.A. 56:8-1 to -206.

have insurance, but they have no liability
insurance. . . .

The fact that . . . there's no contest
and no dispute that NJM offered the option of
having the insured purchase UM/UIM coverage
to equal the amount purchased by the insured
for liability coverage. There's no dispute
as to that. That was the option of the
consumer, and the consumer chose not to do it.

. . . .

Based upon that highly regulatory and
statutory scheme, the purported amendment to
include the claim for a violation of the [CFA]
would be futile, and it would certainly be
prejudicial to this defendant who has been
litigating this case without that allegation
presented before [it] until two weeks before
trial.

On June 18, 2015, the first judge issued his reserved
decision, granting NJM's summary judgment motion and dismissing
all claims against NJM with prejudice. The judge set forth his
reasons in a thirty-eight-page written opinion. He first noted
that plaintiffs were not entitled to assert a UIM claim because
Tarakanov had $100,000 of liability coverage, and plaintiffs had
the same amount of UIM coverage. He then concluded, "Even if . . .
a mistake could be found in this case, the [c]ourt cannot find
that any fraudulent or unconscionable conduct has taken place to
merit reformation."

The judge further ruled that plaintiffs' "expert's opinion
in this case will play no part in the discussion of whether

13                                          A-5505-14T1

[plaintiffs] are entitled to reformation of the insurance policy or damages, because [the expert] has rendered an inadmissible net opinion." The judge further found that NJM was "entitled to immunity under N.J.S.A. 17:28-1.9," providing it with "a shield against both claims for reformation and damages." He therefore granted NJM's summary judgment motion and dismissed plaintiffs' complaint. This appeal followed.

## II.

We first address the Law Division order denying plaintiffs' motion to amend their complaint to assert a CFA claim. Our Supreme Court has "made clear that 'Rule 4:9-1 requires that motions for leave to amend be granted liberally' and that 'the granting of a motion to file an amended complaint always rests in the court's sound discretion.'" Notte v. Merchs. Mut. Ins. Co., 185 N.J. 490, 501 (2006) (quoting Kernan v. One Washington Park Urban Renewal Assocs., 154 N.J. 437, 456-57 (1998)). "That exercise of discretion requires a two-step process: whether the non-moving party will be prejudiced, and whether granting the amendment would nonetheless be futile." Ibid.

A plaintiff may pursue a CFA claim "against an insurance company for 'fraudulent, deceptive or other similar kind of selling or advertising practices,' [but] there are limits on the statute's application." Myska, supra, 440 N.J. Super. at 485 (quoting

14

<u>Daaleman v. Elizabethtown Gas Co.</u>, 77 <u>N.J.</u> 267, 271 (1978)). "To prevail on a CFA claim, a plaintiff must establish three elements: '1) unlawful conduct by defendant; 2) an ascertainable loss by plaintiff; and 3) a causal relationship between the unlawful conduct and the ascertainable loss.'" <u>Id.</u> at 484 (quoting <u>Zaman v. Felton</u>, 219 <u>N.J.</u> 199, 222 (2014)). Under the CFA, an "unlawful practice" includes

> any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby.
>
> [<u>N.J.S.A.</u> 56:8-2.]

In <u>Myska</u> we further noted that, although "the CFA 'encompass[es] the sale of insurance policies as goods and services that are marketed to consumers,' it was not intended as a vehicle to recover damages for an insurance company's refusal to pay benefits." <u>Myska</u>, <u>supra</u>, 440 <u>N.J. Super.</u> at 485 (quoting <u>Lemelledo v. Benefit Mgmt. Corp.</u>, 150 <u>N.J.</u> 255, 270 (1997)). We nevertheless agreed that "<u>Lemelledo</u> authorizes pursuit of a private right of action against an insurance company for 'fraudulent, deceptive or

other similar kind of selling or advertising practices.'" Ibid. (quoting Daaleman, supra, 77 N.J. at 271).

Here, plaintiffs do not seek to recover damages for an alleged refusal to pay benefits; instead, plaintiffs seek reformation of their NJM policy to match their UM/UIM coverage with their $500,000 of liability coverage. In their initial complaint against NJM, plaintiffs alleged NJM's conduct represents "gross negligence, willful and wanton conduct and malice as a matter of law." These allegations not only loosely track the exception to the immunity statute, N.J.S.A. 17:28-1.9, they also allege conduct that would violate the CFA's broad proscription "of any unconscionable commercial practice, deception . . . , misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission." N.J.S.A. 56:8-2.

Based upon our review of the record, including the admitted "backward" procedure followed in the initiation and amendment of plaintiffs' policy, and the opinions of plaintiff's expert, we reject the conclusion plaintiff's proposed amended complaint "would be futile." Additionally, we discern no prejudice to NJM by the proposed amendment since the CFA claim is based on the same underlying facts and events set forth in the original pleading. We further conclude NJM has no cause to complain of the late

16 A-5505-14T1

assertion of claims grounded on the same conduct already alleged in the complaint. We hold that no cognizable prejudice will inure to NJM by the amendment sought by plaintiffs. We therefore reverse the May 29, 2015 order denying plaintiffs' motion to file an amended complaint.

## III.

We next address the rejection of the report of plaintiffs' expert as a net opinion. The admissibility of expert testimony is committed to the sound discretion of the trial court. Townsend v. Pierre, 221 N.J. 36, 52 (2015). A trial court's grant or denial of a motion to preclude expert testimony is entitled to deference on appellate review. Ibid. Our Supreme Court has instructed us to "apply [a] deferential approach to a trial court's decision to admit expert testimony, reviewing it against an abuse of discretion standard." Id. at 53 (alteration in original) (quoting Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 371-72 (2011)).

N.J.R.E. 702 and 703 frame our analysis for determining the admissibility of expert testimony. N.J.R.E. 702 identifies when expert testimony is permissible and requires the experts to be qualified in their respective fields. N.J.R.E. 703 addresses the foundation for expert testimony. Expert opinions must "be grounded in 'facts or data derived from (1) the expert's personal observations, or (2) evidence admitted at the trial, or (3) data

17

relied upon by the expert which is not necessarily admissible in evidence but which is the type of data normally relied upon by experts.'" Townsend, supra, 221 N.J. at 53 (quoting Polzo v. Cty. of Essex, 196 N.J. 569, 583 (2008)).

"The net opinion rule is a 'corollary of [N.J.R.E. 703] . . . which forbids the admission into evidence of an expert's conclusions that are not supported by factual evidence or other data.'" Id. at 53-54 (alteration in original) (quoting Polzo, supra, 196 N.J. at 583). Therefore, an expert is required to "'give the why and wherefore' that supports the opinion, 'rather than a mere conclusion.'" Id. at 54 (quoting Borough of Saddle River v. 66 E. Allendale, LLC, 216 N.J. 115, 144 (2013)). The net opinion rule directs "that experts 'be able to identify the factual bases for their conclusions, explain their methodology, and demonstrate that both the factual bases and the methodology are reliable.'" Id. at 55 (quoting Landrigan v. Celotex Corp., 127 N.J. 404, 417 (1992)). In short, the net opinion rule is "a prohibition against speculative testimony." Harte v. Hand, 433 N.J. Super. 457, 465 (App. Div. 2013) (quoting Grzanka v. Pfeifer, 301 N.J. Super. 563, 580 (App. Div. 1997), certif. denied, 154 N.J. 607 (1998)).

Plaintiffs argue the Law Division abused its discretion when it rejected Castellini's report as a net opinion. We agree.

18

Castellini based his report on his extensive background, education, and experience, along with his review of the significant record in this case. He has been actively involved in the insurance business and its regulation for many years, dating back to the enactment of No Fault Insurance in New Jersey. He properly based his conclusions on these facts and experiences. See Townsend, supra, 221 N.J. at 53 (quoting Polzo, supra, 196 N.J. at 583).

IV.

Our review of a ruling on summary judgment is de novo. Parsons v. Mullica Twp. Bd. of Educ., 440 N.J. Super. 79, 83 (App. Div. 2015). We apply the same legal standard as the trial court. Ibid. Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c). When determining whether the record contains a genuine issue of material fact, the court must consider "whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in

favor of the non-moving party." <u>Brill v. Guardian Life Ins. Co. of Am.</u>, 142 <u>N.J.</u> 520, 540 (1995).

NJM argues the Law Division properly granted summary judgment, claiming entitlement to immunity, pursuant to <u>N.J.S.A.</u> 17:28-1.9, which provides, in pertinent part:

> a. [N]o . . . insurer . . . shall be liable in an action for damages on account of the election of a given level of motor vehicle insurance coverage by a named insured as long as those limits provide at least the minimum coverage required by law or on account of a named insured not electing to purchase [UIM] coverage, collision coverage or comprehensive coverage. Nothing in this section shall be deemed to grant immunity to any person causing damage as the result of [its] willful, wanton or grossly negligent act of commission or omission.
>
> b. The coverage selection form required pursuant to [<u>N.J.S.A.</u> 39:6A-23] shall contain an acknowledgement by the named insured that the limits available to him for [UM] coverage and [UIM] coverage have been explained to him and a statement that no . . . insurer . . . shall be liable in an action for damages on account of the election of a given level of motor vehicle insurance coverage by a named insured as long as those limits provide at least the minimum coverage required by law or on account of a named insured not electing to purchase [UIM] coverage, collision coverage or comprehensive coverage, except for that person causing damage as the result of [its] willful, wanton or grossly negligent act of commission or omission.

<u>N.J.S.A.</u> 17:28-1.9 was enacted "to abrogate prior judicial decisions holding insurers, agents, and brokers liable for failing

to advise their customers of the availability of additional [UM/UIM] coverage" and to quell the "explosion of litigation by providing blanket immunity except in cases of willful, wanton, or gross negligence." Strube v. Travelers Indem. Co., 277 N.J. Super. 236, 237, 242 (App. Div. 1994), aff'd o.b., 142 N.J. 570 (1995).

Immunity applies as long as the insurer establishes the following:

> (1) the named insured's coverage limits were at least the minimum coverage required by law;
>
> (2) the named insured's alleged damages were not caused by a "willful, wanton or grossly negligent act of commission or omission;" and
>
> (3) the carrier complied with the coverage selection requirements of N.J.S.A. 17:28-1.9(b).
>
> [Baldassano v. High Point Ins. Co., 396 N.J. Super. 448, 453-54 (App. Div. 2007).]

In addition, an insurer must have obtained an insured's acknowledgement that the available UM/UIM coverage limits were explained to him, and the insurer will not be liable for the insured's selection of coverage that was chosen in accordance with subsection (a) of the immunity statute. N.J.S.A. 17:28-1.9(b).

If applying for a new policy, the insured must check-off the options elected on the coverage selection form and then sign and return the form to the insurer. N.J.S.A. 39:6A-23(a); N.J.A.C. 11:3-15.7(a). A completed, executed coverage selection form is

"prima facie evidence of the insured's knowing election or rejection of any option." N.J.S.A. 39:6A-23(e).

Significantly, in Avery v. Wysocki, 302 N.J. Super. 186, 190-192 (App. Div. 1997), we held:

> [T]he insured's completion and execution of the coverage selection form is a condition of the grant of immunity by subsection a. It is plain that the purpose of the immunity is to shift the responsibility for coverage selection from the insurer to the insured. It is also plain that under the legislative scheme, the mechanism by which the insured is enabled to make an informed coverage choice and thereby to protect himself is the coverage selection form mandated by N.J.S.A. 39:6A-23 . . . . We think it clear that without this protection, the grant of the immunity by N.J.S.A. 17:28-1.9a would have far harsher consequences than the Legislature intended. That is to say, the subsection a immunity is based on the assumption that the insurer will have complied with the dictates of N.J.S.A. 39:6A-23 by providing the insured with an adequate description of available coverages and their limits.
>
> . . . .
>
> We recognize the salutary purposes of the immunity. We also appreciate, however, that insistence on meticulous compliance with the applicable coverage selection form requirements is the legislative trade-off, as it were, for according the immunity.

In Pizzullo v. New Jersey Manufacturers Insurance Company, 196 N.J. 251 (2008), our Supreme Court addressed the immunity provision at issue in another UIM coverage case involving NJM. In Pizzullo, NJM argued that "because it is a direct-writing insurer

and does not employ brokers or agents, it had no duty to plaintiffs other than to comply with the statutory notification requirements." Id. at 263 (citing Andriani v. N.J. Mfrs. Ins. Co., 245 N.J. Super. 252, 256-57 (App. Div.), certif. denied, 126 N.J. 327 (1991)). NJM asserted "that its customer service representatives are neither agents nor brokers, because they do not offer recommendations or advice about insurance needs, give counsel to the insureds, sell policies or suggest increases or decreases to coverage." Ibid. Notwithstanding "what its customer service representative said" to the plaintiffs in Pizzullo, NJM argued that it was "entitled to immunity because it mailed the plaintiffs the Buyer's Guides and Coverage Selection Forms required by the statute." Ibid.

After reviewing the history of the immunity statute, the Court flatly rejected the "blanket immunity" advanced by NJM. Id. at 268. Viewed in its historical context, the Court concluded "the Legislature meant the statute to confer immunity in circumstances relating to an insured's election of UIM coverage when the insured attempts to later shift the blame for a decision to opt for any level of coverage less than the maximum back onto the insurer." Ibid.

Because the inadequate UIM coverage in Pizzullo resulted from inaccurate responses the plaintiff received from the NJM

23

representative, the Court rejected NJM's argument that the plaintiff made an "election of . . . coverage," N.J.S.A. 17:28-1.9(b), that triggered immunity for NJM. Pizzullo, supra, 196 N.J. at 269-70. After concluding the immunity statute did not apply, the Court reinstated the monetary judgment previously entered by the Law Division in favor of the plaintiffs following trial. Id. at 274.

Applying the analysis employed by the Court in Pizzullo, we are satisfied the record here clearly raises factual questions precluding summary judgment. Viewed in the light most favorable to plaintiffs, April never made an election of any coverages to trigger immunity in favor of NJM; instead, Ennis offered to make the policy elections, and April accepted his offer. Moreover, in 2000, April signed the CSF before any selections were made, a procedure which NJM's own underwriting manager described as "backward." The statute grants an insurer immunity upon "the insured's completion and execution of the coverage selection form," Avery, supra, 302 N.J. Super. at 190, not the insurer's "call center rep." On remand, we expect the trial court will address, with the benefit of a full trial record, whether NJM's handling of plaintiffs' policy resulted in the required "meticulous compliance with the applicable coverage selection form requirements." Id. at 192.

Of further note, the Court in <u>Pizzullo</u> reaffirmed well-established principles that we find apply to the unusual factual circumstances under review:

> An insurance company is "expert in its field and its varied and complex instruments are prepared by it unilaterally whereas the assured or prospective assured is a [lay person] unversed in insurance provisions and practices." <u>Gibson v. Callaghan</u>, 158 <u>N.J.</u> 662, 669, (1999) (quoting [<u>Allen v. Metro. Life Ins. Co.</u>, 44 <u>N.J.</u> 294, 305 (1965)]). Because of the substantial disparity in the sophistication of the parties, and because of the highly technical nature of insurance policies, we have long "assume[d] a particularly vigilant role in ensuring their conformity to public policy and principles of fairness." <u>Id.</u> at 669-70 (quoting <u>Voorhees v. Preferred Mut. Ins. Co.</u>, 128 <u>N.J.</u> 165, 175 (1992)).

> [<u>Pizzullo</u>, <u>supra</u>, 196 <u>N.J.</u> at 270.]

The record also contains substantial evidence that supports the opinion of plaintiffs' expert that NJM arbitrarily established its own internal processes and procedures regarding the sale of UM/UIM coverage, contrary to "accepted standards and practices relative to the matching of an insured's UM/UIM limits to the policy's liability limits." The record contains no contrary expert opinions.

In addition, notwithstanding the contention of NJM counsel at oral argument that "it's NJM's practice not to advise as to coverages," the record contains compelling evidence to the

contrary. The record clearly reflects that Ennis advised April regarding the option and the benefit of adding an endorsement to plaintiffs' commercial auto policy that would provide plaintiffs with personal injury protection (PIP) coverage, if they were driving or occupying a non-owned vehicle. He also recommended plaintiffs increase the medical expense benefits portion of their PIP coverage from $250,000 to $1 million. April accepted these recommendations and Ennis amended plaintiffs' policy to implement these important changes.[9]

Having identified two major deficiencies in plaintiffs' policy, and having rectified them for plaintiffs, a major issue that remains is why Ennis failed to identify the deficiency of plaintiffs' UM/UIM coverage not matching their liability coverage. One possible explanation, advanced by plaintiffs' expert, is that NJM maintained a policy, dating back to 1974, to "not . . . actively market" UIM coverage. The record contains no documentation announcing a change in the policy announced in NJM's 1974 memo.

We conclude the record clearly indicates factual questions precluding summary judgment: first, whether NJM complied with the

---

[9]    We do not suggest any criticism of the changes Ennis recommended and made to plaintiffs' policy. To the contrary, it appears these changes reflected wise counsel and resulted in much improved coverage for plaintiffs.

coverage selection requirements of the immunity statute, and second, whether NJM caused plaintiffs' damages by a "willful, wanton or grossly negligent act of commission or omission." N.J.S.A. 17:28-1.9.

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION