912 A.2d 184 (2006)
389 N.J. Super. 207
Barbara STOFFELS, Plaintiff-Appellant,
v.
HARMONY HILL FARM, John A. Cammeyer and Barbara Cammeyer, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued September 27, 2006.
Decided December 18, 2006.
*185 Christine P. O'Hearn, Westmont, argued the cause for appellant (Brown & Connery, attorneys; Ms. O'Hearn, on the brief).
Virginia M. Barrett, argued the cause for respondents (Barrett, Lazar & Lincoln, attorneys, Maywood; Ms. Barrett, of counsel and on the brief).
Before Judges CUFF, FUENTES and MESSANO.
The opinion of the court was delivered by
CUFF, P.J.A.D.
This appeal raises issues of first impression regarding the interpretation of the statute governing the responsibilities and liabilities of individuals involved in equestrian activities. Plaintiff appeals from an order granting summary judgment in favor of defendants, the owners of the horse plaintiff was riding when she was thrown and injured. We affirm in part, reverse in part and remand for trial.
Our standard of review of a summary judgment order is the same as the motion judge. Prudential Prop. & Cas. Ins. Co. v. Boylan, 307 N.J.Super. 162, 167, 704 A.2d 597 (App.Div), certif. denied, 154 N.J. 608, 713 A.2d 499 (1998). Thus, we canvass the record to determine whether there are any genuine issues of fact, noting that in Brill v. Guardian Life Insurance Co. of America, 142 N.J. 520, 666 A.2d 146 (1995), the Court stated:
[A] determination whether there exists a "genuine issue" of material fact that precludes summary judgment requires the motion judge to consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party.
[Id. at 540, 666 A.2d 146.]
The following are the facts viewed in the light most favorable to plaintiff.
Defendants Barbara Cammeyer, a lifelong horsewoman, and her husband[1] purchased Harmony Hill Farm in 1990 in order to enjoy their respective hobbies of training fox hunters and breeding thoroughbred racehorses. They regularly *186 kept twenty horses on the farm, ten of which were theirs. The remainder belonged to various boarders. Defendant employed a variety of freelance riders/trainers to assist her in training and exercising her fox hunters. She did not require that those she hired possess particular training certifications, preferring to assess for herself whether these riders/trainers possessed suitable skills to work with her horses.
In the summer of 2002, defendant began looking for some "green" horses to train and sell as fox hunters. She communicated with Kristin Gabrielson, a certified horse trainer in Minnesota, who had a number of horses for sale. Defendant told Gabrielson that she was looking for horses that were quiet and had no vices, including bucking. After viewing videos of Gabrielson's horses, defendant decided in December 2002 to pay a visit to Gabrielson's farm.
While in Minnesota, defendant learned that one of the sale horses, a five-and-one-half-year-old Belgian Paint crossbred mare named Glory, had been used as a driving horse in a paired team for the past two years, and that Gabrielson herself had just broken her to saddle a few months earlier. During the two months prior to defendant's visit, Gabrielson had been riding Glory two to three times per week. She showed defendant a videotape of Glory calmly galloping across a field while under saddle, as well as being ridden past a number of potentially scary objects without incident. Gabrielson vouched for Glory and the other sale horses by noting that she had recently recovered from a broken neck and now only rode horses she felt were completely safe. Gabrielson submitted an affidavit in support of defendants' motion for summary judgment in which she confirmed Glory's prior training schedule and also asserted that she never knew Glory to buck.
Due to the extreme cold, defendant rode Glory in Gabrielson's indoor riding arena and found Glory to be responsive and obedient. Defendant ultimately purchased Glory and four other horses from Gabrielson: three additional Belgian Paint crossbreds that she named Glimmer, Gabriella, and Gypsy; and a registered quarter horse named Gigi. Of these horses, Glimmer was both the youngest, at only four years of age, and the smallest, at just over fifteen hands. Gigi was the next in size, followed by Glory, at 15.2 hands, then Gabriella, and finally Gypsy who, at seventeen hands, was the largest of the group.[2]
After concluding the sale, defendant asked Gabrielson to continue working all five of the horses until she could have them shipped to New Jersey. Although Gabrielson agreed, defendant did not know whether Gabrielson actually did so. The horses were not delivered to defendant until February 26, 2003.
Upon the arrival of her new horses, defendant selected from among her six saddles of varying sizes and styles to find the one(s) that best fit each horse. She found that two of her wider saddles fit Glory, who had a relatively broad back. Defendant also fit Glory with a bridle and a gentle snaffle bit.
Defendant found Glory to be the easiest and quietest of the five new horses to ride, even though she was still "green." Two of the other new horses, Gabriella and Gypsy, *187 were difficult from the start and bucked off their respective riders on one or more occasions. Defendant insisted that she rode Glory without incident both in her outdoor ring and cross-country.
According to defendant, Glory was ridden on a daily basis in March and April either by herself or by one of six other riders/trainers defendant regularly employed. She further maintained that she personally rode Glory three times per week. However, defendant was unable to produce a riding log for March, and she could not recall whether Glory was actually ridden that month or whether the weather, a trip defendant might have taken, an operation she had undergone, or a possible breakdown of the tractor she used to clear her property, had prevented all riding. She did note that because she was accustomed to riding in the snow, she did not have an indoor riding ring.
Additionally, according to an April riding log produced by defendant, Glory was exercised on only ten occasions, including six times under saddle with either defendant or one other rider, between April 3 and April 23. Defendant acknowledged that she was somewhat short-handed in March and April because the young woman she had hired as her assistant in return for room and board had not yet arrived.
Sometime after she received her new horses, and prior to the arrival of her assistant, defendant advised the members of the Horsemen's Association of Millstone Township that she had horses that "needed exercising" and that members should call her if they were interested in riding. Defendant also sent a follow-up e-mail to the same effect. Plaintiff obtained a copy of this e-mail from her daughter and sent the following reply:
My daughter . . . tells me that you have several horses that would profit from being exercised and that I should give you a call. . . . I would be very interested in riding with you if I meet your criteria.
I'm 5'1" . . . short and stocky, but have had several years riding and training Morgans. I think we were ahead of the curve then, because we liked to trail ride our Morgans instead of riding with long hooves Saddleseat. I have ridden Eng and Western, trail and Saddleseat, but don't jump. Mostly cause I'm chicken.
I watch my kids go over fences, and my grandkids, but they can have it. I would like something low to the ground cause I have a wee touch of arthritis . . . but have been riding actively until last fall. In fact, . . . [I rode as part of a] drill team a year ago.
At her deposition, plaintiff stated that, at the time she sent her e-mail, she was sixty-two years old and weighed approximately 200 pounds. Her first riding experience dated back to 1972 when her former husband purchased a four-year-old horse for her. This horse stood fifteen hands high and plaintiff rode him regularly both in a ring and on trails for seven years. In 1973, plaintiff and her former husband bought a farm where they bred, trained, rode and showed registered Morgan horses for the next ten years. Following her divorce in 1983, plaintiff rented a farm for her remaining eight horses and cared for them herself. She sold the last of her horses in 1986 after developing lupus and did not ride until 1998, after undergoing arthroscopic surgery on her left knee and ankle. She subsequently rode as part of a drill team in 2000 and 2001, and then began riding her son-in-law's horse on a regular basis in 2002, as well as other horses her family acquired during this time period.
*188 On April 24, 2003, plaintiff arrived at defendant's farm and signed a standard release form. Plaintiff insisted that she and defendant did not discuss her riding experience or the experience of Glory. She had no independent recollection of defendant telling her that Glory was green but had been ridden by many people.
Plaintiff expressed some concern about Glory's size, but defendant told her that Glory was the smallest horse she had. Although plaintiff still thought that Glory was too large for her, she said nothing further. She did ask whether Glory's bridle, a snaffle bit and thin reins, were suited to Glory, given the mare's "heavy" appearance, but defendant assured her that this was Glory's standard equipment.
Defendant suggested that plaintiff first ride Glory in her outdoor ring to see if she was comfortable with her before they headed out on the trail. Plaintiff subsequently spent approximately ten minutes riding Glory at both a walk and a trot and performed some figure eights, with defendant watching intermittently. Although plaintiff found Glory to be somewhat heavy, she also found her to be responsive to the bit and did not encounter any problems. She then followed defendant, who was riding Glimmer, down the driveway and into the woods.
After approximately twenty more minutes of walking and trotting without incident, plaintiff followed defendant as she rode down a steep ravine and then turned to ride up the slope. As plaintiff was attempting to turn Glory left around a stump at the bottom of the ravine, the horse suddenly bucked three times, causing plaintiff to fall off to the left onto the ground. After plaintiff declined defendant's offer to call an ambulance, defendant retrieved her car and drove plaintiff to the hospital. Plaintiff suffered significant injuries that required several surgical procedures.
Plaintiff asserts that defendant was negligent because defendant provided her an untrained horse, that defendant did not advise her the horse was green or untrained, and that defendant failed to adequately inquire about plaintiff's riding experience in order to provide her a suitable mount. In support of her motion for summary judgment, plaintiff submitted the report of an expert in equine behavior and training. The expert opined that Glory was barely broken to saddle and that a rider of plaintiff's experience should not have been assigned to Glory. The expert concluded that defendant was negligent because she failed to assess plaintiff's experience, failed to assess the experience of the horse, and made material misrepresentations regarding the experience, training and suitability of the horse.
The motion judge held that the release signed by plaintiff did not insulate defendant from liability. He found, however, that plaintiff had made significant representations about her riding experience and that defendant had no knowledge of Glory's propensity to lurch until the April 24 incident with plaintiff. He found that Glory's behavior during that ride was an inherent risk of horseback riding. Therefore, he held that plaintiff's complaint against defendant was barred by N.J.S.A. 5:15-3.
In 1997, the Legislature enacted the equine activities statute, N.J.S.A. 5:15-1 to -12 (the Act), that generally insulates an operator of an equine facility from liability for injuries sustained by persons engaged in equine activities. The Legislature accomplished this by declaring that a participant or spectator assumes the inherent risks of equine animal activities. N.J.S.A. 5:15-3 provides:

*189 A participant[3] and spectator[4] are deemed to assume the inherent risks of equine animal activities[5] created by equine animals,[6] weather conditions, conditions of trails, riding rings, training tracks, equestrians, and all other inherent conditions. Each participant is assumed to know the range of his ability and it shall be the duty of each participant to conduct himself within the limits of such ability to maintain control of his equine animal and to refrain from acting in a manner which may cause or contribute to the injury of himself or others, loss or damages to person or property, or death which results from participation in an equine animal activity.
N.J.S.A. 5:15-2 defines "inherent risk or risks of an equine activity" as
those dangers which are an integral part of equine animal activity, which shall include but need not be limited to:
a. The propensity of an equine animal to behave in ways that result in injury, harm, or death to nearby persons;
b. The unpredictability of an equine animal's reaction to such phenomena as sounds, sudden movement and unfamiliar objects, persons or other animals;
c. Certain natural hazards, such as surface or subsurface ground conditions;
d. Collisions with other equine animals or with objects; and
e. The potential of a participant to act in a negligent manner that may contribute to injury to the participant or others, including but not limited to failing to maintain control over the equine animal or not acting within the participant's ability.
The Legislature also provided that the risk assumed by the participant operates to bar any suit and serves as a complete defense to any suit. N.J.S.A. 5:15-5 states in pertinent part:
The assumption of the risk set forth in [N.J.S.A. 5:15-3] shall be a complete bar of suit and shall serve as a complete defense to a suit against an operator by a participant for injuries resulting from the assumed risks, notwithstanding the provisions of [N.J.S.A.] 2A:15-5.1 et seq. relating to comparative negligence.
In enacting this statute, the Legislature made the following findings and declarations:
The Legislature finds and declares that equine animal activities are practiced by a large number of citizens of this State; that equine animal activities attract large numbers of nonresidents to the State; that those activities significantly contribute to the economy of this State; and that horse farms are a major land use which preserves open space.
The Legislature further finds and declares that equine animal activities involve risks that are essentially impractical or impossible for the operator to eliminate; and that those risks must be borne by those who engage in those activities.
The Legislature therefore determines that the allocation of the risks and costs *190 of equine animal activities is an important matter of public policy and it is appropriate to state in law those risks that the participant voluntarily assumes for which there can be no recovery.
[N.J.S.A. 5:15-1.]
The broad protection afforded to operators of equine animal activities is not absolute. Five exceptions are recognized: They are:
(a) Knowingly provid[es] equipment or tack that is faulty to the extent that it causes or contributes to injury.
(b) Fail[s] to make reasonable and prudent efforts to determine the participant's ability to safely manage the particular equine animal, based on the participant's representation of his ability. . . .
(c) [Fails to post warning signs in] [a] case in which the participant is injured or killed by a known dangerous latent condition on property owned or controlled by the [operator]. . . .
(d) [Commits] [a]n act or omission . . . that constitutes negligent disregard for the participant's safety, which act or omission causes the injury, and
(e) Intentional[ly] injur[es] . . . the participant.
[N.J.S.A. 5:15-9 (emphasis added).]
These exceptions, set forth in N.J.S.A. 5:15-9, comport with the holdings in the few New Jersey cases pre-dating the Act. See Hodge v. Montclair Riding Club, Inc., 130 N.J.L. 331, 332, 32 A.2d 840 (Sup. Ct.1943) (judgment in favor of rider who suffered severe injuries when hired horse reared and fell on top of her affirmed where defendant horse owner knew of horse's propensity and failed to warn rider); Hahn v. Rockingham Riding Stables, 126 N.J.L. 324, 327-28, 19 A.2d 191 (E. & A.1941) (judgment in favor of rider thrown by hired horse where defendant horse owner knew that horse had been previously injured and was unfit at the time of hiring).
It is undisputed that plaintiff's activities are governed by the equine activities statute. The issue for our resolution is whether defendant failed to make a reasonable and prudent effort to ascertain plaintiff's riding experience and/or whether she misrepresented Glory's gentleness or failed to exercise reasonable care in assigning plaintiff to an inexperienced mount. These acts or omissions, if proved, would deprive defendant of the statutory limitation on liability.
Contrary to plaintiff's assertion, we hold that defendant was entitled to rely on the representations made in plaintiff's e-mail. In that message, plaintiff related that she had trained and ridden Morgans for years, that she had a "wee" touch of arthritis that led to her preference for smaller horses and that she had participated in a drill team for two years and rode as recently as the prior Fall. The motion judge termed these representations "compelling." We agree. Given the extensive representations of her equestrian accomplishments, it would be curious for defendant to commence a cross-examination of plaintiff's representations. Moreover, we recognize that defendant extended plaintiff the invitation and learned of the riding opportunity presented by defendant at a regular meeting of horsemen. The context further supports reliance on plaintiff's representations.
The second exception to the immunity afforded by the Act is a closer question. Plaintiff contends that defendant negligently disregarded her safety when defendant assigned Glory to her. Plaintiff has no recollection that defendant informed her that Glory was unaccustomed to being ridden or that the horse had been ridden by many people. Plaintiff insists, *191 however, that she expressed reservations about Glory's size and the bridle. Nevertheless, she concedes that she mounted Glory when advised that defendant did not have a smaller horse and that the bridle was the animal's usual equipment. Glory also was about the same size as the breed plaintiff stated she bred and trained. On the other hand, plaintiff was not informed that Glory was a recent acquisition with limited experience under saddle. She had also expressed to defendant that she was nervous and plaintiff's small stature and excessive weight was readily observable to defendant. Notably, plaintiff's expert stated:
Matching a horse with barely 30 rides to a rider, regardless of the amount of experience, whose capabilities one does not know well would horrify any responsible trainer or instructor. The situation is made worse if, as in this case, the rider is not in good physical condition, has not ridden regularly for some time, and especially expresses nervousness. . . . The risk of a bad match is that any horse may reach its threshold of tolerance of the rider and get rid of the rider, or run home, or do something equally awful.
Plaintiff's expert further remarked that Glory was not an experienced horse that lacks training; rather, "[t]his is a horse barely broke to ride."
We recognize that a fall from a horse is an inherent risk of horseback riding. On the other hand, the immunity offered by the statute is not absolute. The failure to take reasonable measures to match the rider to a suitable mount falls easily within exception (d) of the Act as "an act or omission on the part of the operator that constitutes negligent disregard for the participant's safety. . . ." N.J.S.A. 5:15-9(d).
Here, we are not satisfied that defendant's conduct in assigning Glory to plaintiff is so one-sided that a reasonable jury would not find her negligent. Brill, supra, 142 N.J. at 540, 666 A.2d 146. Plaintiff's expert opined that the horse was barely broken and defendant had a limited opportunity to assess the horse she assigned to plaintiff. Therefore, we remand for trial solely on the issue of whether defendant was negligent when she assigned plaintiff to Glory in light of Glory's inexperience under saddle. We affirm, however, the summary judgment entered in favor of defendant regarding her reliance on plaintiff's representations of her extensive experience as an equestrian.
Affirmed in part; reversed in part; remanded for trial.
NOTES
[1] Plaintiff dealt solely with defendant Barbara Cammeyer; therefore, any reference to defendant is to Barbara Cammeyer.
[2] A "hand" is a unit of measure equal to four inches. Webster's Ninth New Collegiate Dictionary 549 (1984). A horse's height is measured at the withers, the ridge between the shoulder bones of a horse, at the base of its neck. The National Horseracing Museum, http://www.horseracinghistory.co.uk (last visited July 11, 2006). Thus, Glory stood five foot, two inches tall, although her actual back was likely slightly lower.
[3] N.J.S.A. 5:15-2 defines "participant" as "any person, whether an amateur or professional, engaging in an equine animal activity, whether or not a fee is paid. . . ."
[4] N.J.S.A. 5:15-2 defines "spectator" as "a person who is present in an equestrian area for the purpose of observing animal equine activities whether or not an invitee."
[5] N.J.S.A. 5:15-2 defines "equine animal activity" to include "any activity that involves the use of an equine animal. . . ."
[6] N.J.S.A. 5:15-2 defines an "equine animal" to include a horse.