**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2790-23

CHAD JORDAN and
KATHERINE COHEN, h/w,

     Plaintiffs-Appellants,

v.

SWEET HAVEN FARMS, LLC,
WILLIAM WILCZYNSKI, and
KATHERINE WILCZYNSKI,

     Defendants-Respondents.

_____

Submitted May 14, 2025 – Decided July 2, 2025

Before Judges Marczyk and Paganelli.

On appeal from the Superior Court of New Jersey, Law Division, Salem County, Docket No. L-0087-22.

Saltz Mongeluzzi Bendesky, PC, and Samuel A. Haaz (Saltz Mongeluzzi Bendesky, PC) of the Pennsylvania bar, admitted pro hac vice, attorneys for appellants (Robert W. Zimmerman and Samuel A. Haaz, on the briefs).

Rawle & Henderson, LLP, attorneys for respondents (Michael J. Dunn, on the brief).

PER CURIAM

Plaintiffs Chad Jordan (Jordan) and Katherine Cohen (Cohen) appeal from the trial court's April 18, 2024 order granting defendants Sweet Haven Farms, LLP (Sweet Haven), William Wilczynski (William), and Katherine Wilczynski's (Katherine)[1] motion for summary judgment and dismissing plaintiffs' complaint with prejudice. This matter presents an issue regarding the applicability of the New Jersey Equestrian Activity Liability Act ("Equine Act" or "Act"), N.J.S.A. 5:15-1 to -12, in the context of an alleged misrepresentation in the sale of a horse with purported dangerous tendencies, which resulted in a personal injury.

Plaintiffs allege they purchased a horse from defendants, relying on defendants' representations that the horse could be safely ridden and was suitable for a man of Jordan's size. We address whether N.J.S.A. 5:15-5 affords defendants immunity against plaintiffs' claims arising from injuries sustained by Jordan when he attempted to mount the horse twelve weeks after purchase, and whether the exceptions to immunity under N.J.S.A. 5:15-9(b) and (d) apply, based on defendants' failure to match Jordan with a suitable horse and failure to disclose the horse's dangerous propensities at the time of the sale. Following

_____

[1] Because defendants share the same last name, we refer to them by their first names to avoid confusion. We intend no disrespect in doing so.

our review of the record and the applicable legal principles, we hold under the facts presented here, defendants had a duty to disclose the horse's known vices and dangerous propensities at the time of the sale. Therefore, viewing the facts in a light most favorable to plaintiffs, because there are fact issues that must be resolved by a jury as to whether the exceptions to immunity pursuant to N.J.S.A. 5:15-9(b) and (d) are applicable in this matter, we reverse.

I.

The Wilczynskis are the owners and operators of Sweet Haven horse farm. In the spring of 2021, plaintiffs inquired about purchasing a horse for trail riding from defendants that could accommodate Jordan, who was six-foot-three-inches and weighed approximately 220 pounds, and his then-eleven-year-old daughter. Defendants indicated they had an Arabian horse named Pyxy Ali (Ali) who could be ridden by someone Jordan's size, was in good health, suitable for trail riding, and would also be safe for Jordan's daughter and wife, Cohen, to ride. Jordan testified at his deposition he had never purchased a horse and relied on defendants' representations regarding Ali. Plaintiffs claim defendants never

3

informed them that Ali had prior incidents of "bolting,"[2] which resulted in two other riders being injured within the past two years.

On June 6, 2021, plaintiffs purchased Ali for $1,000. They boarded Ali at Sweet Haven, and Jordan testified he rode the horse on Sweet Haven's trails approximately four or five times between June 10 and August 28, 2021.

On August 29, 2021, Jordan suffered serious injuries when he attempted to mount Ali. He stated the last thing he remembered was putting his left foot in the stirrup to pull himself onto Ali and then recalled "[b]eing on the ground" in pain. He indicated he "do[es no]t know exactly what happened between [him] getting on the horse and being on the ground."

Katherine was the only other eyewitness to the incident. She testified that she "looked up and saw [Jordan] attempting to mount Ali from the ground." She observed Jordan's left foot in the stirrup as he tried to "swing his right leg up over [Ali]." She stated Ali "popp[ed] off the ground about 8 inches to a foot" approximately four times as Jordan attempted to mount her. She believed that on the fourth attempt, Jordan "released his foot out of the left stirrup and fell to

---

[2] Plaintiffs use the terms bolting and bucking to describe the horse's behavior. "Bolting" occurs when a horse suddenly and unexpectedly runs away at full speed. "Bucking" is when a horse raises its hind limbs in the air with total body weight on the front limbs.

A-2790-23

his left side and rolled to his stomach." Sierra Willingham, who worked at Sweet Haven, spoke with Katherine following the incident. She testified that Katherine advised her that as Jordan was attempting to mount Ali, the horse "just bolted."

When Jordan was recovering in the hospital, Cohen received a text message from Sharon Kaminski, an acquaintance who also rode horses at Sweet Haven and was familiar with Ali. Kaminski informed Cohen that Ali had previously injured two other riders at the farm—Katherine, and Christina Jacobson. Cohen further testified that Kaminski told her she was upset and that she should have advised her about other incidents involving Ali before plaintiffs purchased the horse.

Jacobson testified she leased Ali from defendants in the fall of 2020, just months prior to plaintiffs' purchasing the horse. She indicated that before deciding to lease Ali, Katherine introduced her to the horse and disclosed that she was previously injured when Ali bolted on her. Jacobson recounted an incident within a few weeks of leasing Ali, where Ali bolted on her as they were finishing a ride. Jacobson stated Ali suddenly "took off," and she could not stop the horse. She fell off the saddle and ended up "badly" injuring her hip and breaking her middle finger. Jacobson stated she informed the Wilczynskis about the incident in November 2020.

A-2790-23

Katherine testified when she was riding Ali in January 2020, she did not realize she had dropped the rein, which caused the horse to step on it. She stated the saddle slipped and started going under Ali, which "spooked" the horse. She recounted Ali then "took off running," which caused her to dismount, throw herself onto the ground, and break her shoulder.

Willingham also testified regarding Ali's history of bolting. She stated Ali had a reputation at the farm as "the horse that would bolt on you. We all knew it." She acknowledged the bolting incidents occurred prior to plaintiffs' purchase of the horse from defendants.

William conceded bolting is a dangerous activity and should be disclosed to individuals purchasing a horse. However, he disagreed with characterizing the prior incidents described by Jacobson and Katherine as bolting. He testified he never mentioned "the Jacobs[o]n incident" when selling Ali to Jordan but may have discussed his wife's injury while riding Ali. Plaintiffs both denied being advised of any prior bolting incidents involving Ali.

Plaintiffs retained Dr. Carleigh Fedorka, a veterinarian, as an expert in the field of equine science and sales practices. Dr. Fedorka opined that Ali was an inappropriate horse for Jordan due to Ali's small size, advanced age, and poor muscle tone. She noted Ali measured fifty-seven inches tall, which classified

6

her as a pony, not a horse. She also stated Ali's body condition was very thin, with little muscle or fat over her topline. She further noted Ali was twenty-five years old at the time of the sale and suffered from back pain. She opined these factors increased the risk that Ali would bolt due to back pain when Jordan rode her. Dr. Fedorka concluded that because defendants had knowledge of Ali's prior incidents resulting in injuries to riders, they were required to disclose that history.

Plaintiffs filed a complaint alleging negligence based on defendants' failure to disclose Ali's dangerous history of injuring riders prior to the sale and misrepresentations regarding Ali's health and suitability for Jordan to safely ride her. Following discovery, defendants moved for summary judgment seeking to dismiss plaintiffs' complaint under the Equine Act.

Defendants argued the Equine Act, as interpreted by Hubner,[3] applies to this matter and affords them immunity because Jordan's accident involved equestrian activity. They asserted Jordan cannot prove the causation element of his claim because he does not recall how or why he fell from Ali and "had exclusive custody and control over the horse for nearly 12 weeks before the date on which this accident occurred." They conceded Katherine saw the horse lift

---

[3] Hubner v. Spring Valley Equestrian Ctr., 203 N.J. 184 (2010).

A-2790-23

its hooves eight to twelve inches off the ground but asserted that such conduct from a horse is an inherent risk of equestrian activity under the Act.

Moreover, defendants contended the two exceptions to the immunities provided under the Equine Act upon which plaintiffs relied were inapplicable. They argued the first exception—"[f]ailure to make reasonable and prudent efforts to determine the participant's ability to safely manage the particular equine animal," N.J.S.A. 5:15-9(b)—did not apply because defendants did not match Jordan with Ali. Instead, Jordan purchased the horse and rode her for hours at a time over the course of twelve weeks without incident. They averred the second exception—an operator's act or omission that "constitutes negligent disregard for the participant's safety" and causes the injury, N.J.S.A. 5:15-9(d)—was inapplicable because plaintiffs provided no evidence that defendants were negligent, given Jordan rode the horse many times prior to the accident. Defendants claimed that even assuming they had a duty to disclose Ali's prior instances of bolting, plaintiffs could not satisfy the second exception because plaintiffs were unable to demonstrate the failure to disclose caused the accident.

Plaintiffs countered they could prove Ali bucked or bolted on the date of the accident because the horse had prior bolting incidents; Katherine's deposition suggested Ali bucked and bolted; and Willingham testified that

8

Katherine described plaintiff's incident as involving Ali "bolting." They argued, relying on Stoffels v. Harmony Hill Farm,[4] the exceptions under N.J.S.A. 5:15-9(b) and (d) both apply here. Under section (d), plaintiffs contended defendants' failure to disclose Ali's history was not an inherent risk of horseback riding but rather "deals with the decision-making of . . . defendants when they decide to sell a horse." They asserted defendants knew Ali had a history of bolting, contrary to defendants' representations. They maintained defendants breached their duty to disclose "known vices or known instances of bucking and bolting" when such instances caused serious injuries to other riders in the past.

Next, plaintiffs asserted defendants' failure to match Jordan with an appropriate horse would meet an additional exception under N.J.S.A. 5:15-9(b). They contended they relied on defendants' representations as first-time purchasers that Ali could handle Jordan's weight. They claimed that had they known about the bolting incidents or Ali not being the proper size for Jordan, they would never have purchased Ali, and the accident would not have occurred.

---

[4] Stoffels v. Harmony Hill Farm, 389 N.J. Super. 207 (App. Div. 2006).

A-2790-23

On April 18, 2024, the trial court entered an order accompanied by a written opinion granting defendants' motion for summary judgment.[5] The court found defendants were "operators" as defined under the Act because they owned the facility where Ali was boarded and ridden.[6] The court further determined plaintiffs were "participant[s]" under the Act because they rode the horse.[7] Additionally, the court indicated there was no dispute Jordan's injuries occurred when he attempted to mount Ali, which constituted an "inherent risk of equine animal activity" due to an animal's propensity to behave in a manner that results in injury, N.J.S.A. 5:15-2.

The court further found this was the "exact type[] of inherent risk[] that the Legislature deemed participants must assume" under N.J.S.A. 5:15-3. As

---

[5] The court rejected plaintiffs' argument that the Act does not apply to injuries relating to misrepresentations or omissions related to the sale of a horse. Plaintiffs do not challenge the applicability of the Act on appeal.

[6] "'Operator' means a person or entity who owns, manages, controls or directs the operation of an area where individuals engage in equine animal activities whether or not compensation is paid." N.J.S.A. 5:15-2.

[7] "Participant" is defined as "any person . . . engaging in an equine animal activity, whether or not a fee is paid to engage in the equine animal activity . . . or any person coming onto the property of the provider of equine animal activities or equestrian area whether or not an invitee or person pays consideration." N.J.S.A. 5:15-2.

A-2790-23

such, the court concluded the Act applies because Section 5 of the Act provides a complete bar to a participant's suit against an operator where injuries result from an assumed risk of equine activity. It noted plaintiffs' attempt to distinguish the case regarding defendants' duty to disclose information or pair an appropriate horse with a rider "sp[oke] more to the exceptions to the Act rather than removing the case out of the Act's scope entirely." Noting our Supreme Court in Hubner warned against allowing claims that deflect causation onto an earlier action, the court concluded that "as a matter of law," N.J.S.A. 5:15-5 operated as a complete bar to plaintiffs' claims unless an exception applied.

In determining whether plaintiffs' claims could proceed under N.J.S.A. 5:15-9(b) or (d), the court found "the undisputed facts of the case" failed to support plaintiffs' negligence claim because defendants sold Ali to plaintiffs on June 6, 2021, and the injuries did not occur until August 29, 2021. Viewing the disputed testimony regarding Ali's behavior on the day of the incident in the light most favorable to plaintiffs, the court assumed the horse bucked when Jordan attempted to mount it. However, the court found these facts did not indicate a failure to "determine the participant's ability to safely manage the

particular equine animal" under exception (b) because Jordan safely rode Ali for twelve weeks without an issue.

The court further rejected plaintiffs' reliance on Stoffels because, here, defendants did not select a horse for plaintiffs to ride immediately but rather recommended a horse for sale, which had significant experience being ridden. The court noted the "attenuated parallels" between Stoffels and this matter, but ultimately found the case distinguishable. The court emphasized that plaintiffs rode Ali for twelve weeks without any problems, which falls "within the bounds of the complete bar [rather] than the facts of Stoffels."

Lastly, the court rejected plaintiffs' argument that exception (d) applied due to "an act or omission on the part of the operator that constitutes negligent disregard for the participant's safety, which act or omission causes the injury." The court indicated Hubner requires a plaintiff to show the injury was caused by the facility operator's breach of a recognized duty of care owed to the participant. It found the inherent danger of equine activity "indisputably" caused Jordan's injuries, not defendants' alleged failure to disclose Ali's history of bucking. The court stated, "Ali did what horses sometimes do—buck—a type of behavior the Legislature expressly stated participants must assume the risk of happening."

12

As such, the court found defendants' failure to disclose or appropriately pair the horse "did not cause any injury." The court reasoned that if Ali bucked within twelve minutes after the sale, it would be more akin to Stoffels and a closer call as to whether the exception would apply. However, the court determined that if a horse can be ridden without issue, "any subsequent harm must be a logical result of the inherent danger of the sport." The court, therefore, concluded the exceptions did not apply to this case and that plaintiffs' claims must be dismissed as a matter of law.

## II.

An appellate court reviews de novo a trial court's ruling on a motion for summary judgment, applying the same standard used by the trial court. Samolyk v. Berthe, 251 N.J. 73, 78 (2022) (citing Woytas v. Greenwood Tree Experts, Inc., 237 N.J. 501, 511 (2019)). This court must decide whether "there is [a] genuine issue as to any material fact" when the evidence is "viewed in the light most favorable to the non-moving party." Davis v. Brickman Landscaping, Ltd., 219 N.J. 395, 405-06 (2014) (first quoting R. 4:46-2(c); and then quoting Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995)). "To decide whether a genuine issue of material fact exists, the trial court must 'draw[] all legitimate inferences from the facts in favor of the non-moving party.'" Friedman v.

13

Martinez, 242 N.J. 449, 472 (2020) (alteration in original) (quoting Globe Motor Co. v. Igdalev, 225 N.J. 469, 480 (2016)).

"The court's function is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" Rios v. Meda Pharm., Inc., 247 N.J. 1, 13 (2021) (quoting Brill, 142 N.J. at 540). "If there is no genuine issue of material fact, we must then 'decide whether the trial court correctly interpreted the law.'" DepoLink Ct. Reporting & Litig. Support Servs. v. Rochman, 430 N.J. Super. 325, 333 (App. Div. 2013) (quoting Massachi v. AHL Servs., Inc., 396 N.J. Super. 486, 494 (App. Div. 2007)). On de novo review, "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Rowe v. Bell & Gossett Co., 239 N.J. 531, 552 (2019) (alteration in original) (quoting Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

On appeal, plaintiffs argue the court erred in granting defendants' motion because disputed questions of material fact preclude summary judgment, including Ali's tendency to bolt, defendants' knowledge of Ali's history, and Ali's actions on the day Jordan was injured. They assert the court improperly decided disputed questions of fact that must be determined by a jury. Plaintiffs

14

further maintain the Act does not bar their claims because the exceptions under N.J.S.A. 5:15-9(b) and (d) apply to this case. They contend the facts in this case are "far more egregious" than in Stoffels, where this court reversed the trial court's summary judgment order in favor of the defendant horse farm.

Plaintiffs argue actions within defendants' control during a sale do not constitute inherent risks of equine activity within the meaning of the Act. Lastly, they assert the court erred by concluding the proximate cause of the incident was an inherent danger of equine animal activity as opposed to defendants' failure to disclose Ali's bolting or defendants' negligence in pairing Ali with Jordan when the horse was too small for Jordan's stature.

Defendants counter, relying on Hubner, that the Act's immunity provisions should be interpreted broadly and the exceptions narrowly. 203 N.J. at 631. They argue Jordan's injuries "occurred plainly due to the inherent risks of riding a horse" and not from an act or omission of defendants. They also maintain there is no evidence that Ali bucked or bolted to cause Jordan's injuries. They further contend the trial court properly determined the Act barred plaintiffs' claims because none of the exceptions to operator immunity are applicable.

15

The issues presented in this matter require us to address the immunity provisions of the Equine Act, as well as the exceptions therein, against the backdrop of the Hubner and Stoffels decisions. Our primary "task in statutory interpretation is to determine and effectuate the Legislature's intent." Bosland v. Warnock Dodge, Inc., 197 N.J. 543, 553 (2009). "In doing so, we look first to the plain language of the statute, seeking further guidance only to the extent that the Legislature's intent cannot be derived from the words that it has chosen." Pizzullo v. N.J. Mfrs. Ins. Co., 196 N.J. 251, 264 (2008). If the language is unclear or ambiguous, "we look to other interpretive aids to assist us in our understanding of the Legislature's will." Ibid. The task of effectuating the legislative intent "is often assisted by interpreting a statute consistently with the overall statutory scheme in which it is found." Bosland, 197 N.J. at 554.

In enacting the Equine Act, our Legislature found and declared that "equine animal activities involve risks that are essentially impractical or impossible for the operator to eliminate; and that those risks must be borne by those who engage in those activities." N.J.S.A. 5:15-1. As such, the Legislature determined "the allocation of the risks and costs of equine animal activities is an important matter of public policy" and deemed it appropriate "to state in law those risks that the participant voluntarily assumes for which there can be no

16

recovery." Ibid. Our Supreme Court noted the legislative "findings demonstrate an intention to limit claims by participants, by defining those risks that the facility operator cannot effectively eliminate and that the participant assumes, and by precluding any recovery for an injury resulting from any of those assumed risks." Hubner, 203 N.J. at 196.

The "[i]nherent . . . risks of an equine animal activity" entail "dangers which are an integral part of equine animal activity." N.J.S.A. 5:15-2. The Legislature set forth a non-exhaustive list of specific inherent risks, including:

> a. The propensity of an equine animal to behave in ways that result in injury, harm, or death to nearby persons;
>
> b. The unpredictability of an equine animal's reaction to such phenomena as sounds, sudden movement and unfamiliar objects, persons or other animals;
>
> c. Certain natural hazards, such as surface or subsurface ground conditions;
>
> d. Collisions with other equine animals or with objects; and
>
> e. The potential of a participant to act in a negligent manner that may contribute to injury to the participant or others, including but not limited to failing to maintain control over the equine animal or not acting within the participant's ability.
>
> [N.J.S.A. 5:15-2(a) to (e).]

A-2790-23

"A participant . . . [is] deemed to assume the inherent risks of equine animal activities created by equine animals, weather conditions, conditions of trails, riding rings, training tracks, equestrians, and all other inherent conditions." N.J.S.A. 5:15-3. The Legislature declared a participant is "assumed to know the range of his ability" and imposed "the duty o[n] each participant to conduct himself within the limits of such ability to maintain control of his equine animal and to refrain from acting in a manner which may cause or contribute to the injury of himself." Ibid.

The assumption of risk set forth in N.J.S.A. 5:15-3 "shall be a complete bar of suit and shall serve as a complete defense to a suit against an operator by a participant for injuries resulting from the assumed risks . . . ." N.J.S.A. 5:15-5. N.J.S.A. 5:15-9, in turn, provides limited exceptions to "temper" the "apparent breadth of the protections afforded to operators of equine facilities." Hubner, 203 N.J. at 197. The pertinent exceptions to the limitations on operator liability include:

> b. Failure to make reasonable and prudent efforts to determine the participant's ability to safely manage the particular equine animal, based on the participant's representation of his ability . . . .
>
> . . . .

18

> d. An act or omission on the part of the operator that constitutes negligent disregard for the participant's safety, which act or omission causes the injury . . . .
>
> [N.J.S.A. 5:15-9(b), (d).]

The Hubner[8] Court observed the words defining the risks assumed and barring claims which arise from those risks are broadly preclusive while the words delineating the exceptions are equally as broad. 203 N.J. at 197. The Court indicated "the risk assumption and the exception provisions are in conflict," revealing a "latent ambiguity in the overall meaning of the statute." Ibid. The Court expressed concern that simply viewing the words of the exceptions in isolation might "effectively swallow the Act's protections entirely," including, for example, where a facility operator acted with "negligent disregard for a participant's safety." Ibid.

The Hubner Court concluded the Act "is designed to establish a dividing line between the known and inherent risks of the endeavor that are assumed by a participant, and those events or conditions that are within the control of, and thus are part of the ordinary obligations of, the facility's operators." Id. at 203.

---

[8] In Hubner, the plaintiff alleged faulty equipment at the equestrian center caused the plaintiff's injury, implicating N.J.S.A. 5:15-9(a). 203 N.J. at 192-93. The Court found the equipment was not faulty, and the accident occurred as a result of the inherent danger of the equine activity. Id. at 205, 207.

A-2790-23

In resolving the tension between the risks assumed and the exceptions, the Court focused on the legislative policy supporting equine activities.  Id. at 203 (citing N.J.S.A. 5:15-1).  It noted "the Legislature intended that the provisions expressing the scope of the risks assumed would be read broadly in favor of the operators, while the obligations of the operators would be narrowly construed if the two sections of the statute appear to conflict."  Id. at 203-04.  The Hubner Court further observed some exceptions "need[ed] little explanation" and stated exception (b) would apply where, for example, an injury resulted from an operator assigning "a first-time rider to a horse that the operator knows is particularly high-strung, fractious, or difficult to manage."  Id. at 204 (citing N.J.S.A. 5:15-9(b); Stoffels, 389 N.J. Super. at 217-18).[9]

In Stoffels, this court reversed the trial court's order granting the defendants' summary judgment motion and remanded the case for trial to determine whether the operator was negligent in assigning the plaintiff a particular horse, which was inexperienced under saddle.  389 N.J. Super. at 218. There, the defendant-operator advertised she had horses that "needed exercising."  Id. at 212.  The plaintiff expressed interest in the opportunity and

_____

[9] Although the Court cited Stoffels in its discussion of subsection (b), it noted the Stoffels court ultimately considered the "failure to take reasonable measures to match the rider to a suitable mount" under subsection (d).

went to the defendant's farm seeking to ride a horse. Id. at 212-13. The defendant suggested the plaintiff ride a particular horse. Id. at 213. Although the horse had no known dangerous history, the horse had limited experience being ridden. Id. at 213, 218. The plaintiff, who was sixty-two years old and short in stature, had experience in riding horses. Ibid. She expressed concerns about the horse's large size, but nevertheless proceeded to ride it. Ibid. After riding the horse for a short period of time on steep terrain, the horse "suddenly bucked three times, causing [the] plaintiff to fall . . . onto the ground" and suffer significant injuries. Id. at 214.

The plaintiff in Stoffels argued the defendant was negligent in providing her with an untrained horse, not advising her that the horse was untrained, and failing to inquire about the plaintiff's riding experience to match her with a suitable horse. Ibid. This court found the plaintiff's activities fell within the Act and that "[t]he failure to take reasonable measures to match the rider to a suitable [horse] falls easily within exception (d) of the Act as 'an act or omission on the part of the operator that constitutes negligent disregard for the participant's safety.'" Id. at 218 (citing N.J.S.A. 5:15-9(d)). We found sufficient evidence to reverse the trial court's grant of summary judgment because the plaintiff's expert opined the horse was barely broken, and the defendant had an

21

opportunity to assess the horse she assigned to the plaintiff. Ibid. Although we ultimately relied on exception (d), we alternatively could have relied on exception (b) given our focus on the defendant's failure to pair the rider with the proper horse.

Applying these principles to this case, we conclude there exists a genuine issue of material fact as to whether the circumstances presented here implicate the exceptions under both N.J.S.A. 5:15-9(b) and (d). Although the facts here do not involve the precise facts as that of a first-time rider paired with a known fractious horse as described in the Hubner Court's illustration, we are satisfied this matter involves circumstances from which a jury could reasonably find fall within N.J.S.A. 5:15-9(b) because of the alleged mismatch between Jordan's experience and size and Ali's stature and physical issues. Moreover, a jury could find defendants' failure to disclose Ali's dangerous propensities might exempt them from immunity under N.J.S.A. 5:15-9(d).

We recognize defendants dispute Ali's bolting tendencies and whether Ali bolted to cause Jordan's injuries. However, despite Jordan's not recalling precisely what occurred, Willingham testified that Katherine told her Ali "bolted" causing Jordan's fall. Evaluating the facts most favorably to plaintiffs, Ali behaved precisely in the way defendants failed to disclose—by bolting—

22

which, according to Dr. Fedorka, was likely caused by the horse's advanced age and poor physical condition and Jordan's large size, contrary to defendants' alleged representations that the horse would be appropriate for Jordan to ride. Indeed, William conceded—despite denying Ali's history of bolting—that he would inform a buyer about a horse's history of bolting and considered bolting to be dangerous conduct.

The facts here provide a more glaring example of a horse's dangerous propensities than in Stoffels, where we noted the immunity under the Equine Act was not "absolute." 389 N.J. Super. at 218. In Stoffels, the horse at issue had no known dangerous propensities and the prior owner "vouched" for the safety of the horse. Nevertheless, we found the plaintiffs satisfied exception (d) because the plaintiff was not advised the horse was a "recent acquisition with limited experience under [the] saddle." Id. at 210-11, 218. Here, defendants were aware of Ali's dangerous tendencies—viewing the facts most favorably to defendants—yet failed to disclose this information to plaintiffs.

We are mindful that bucking and bolting are normally inherent risks associated with horse riding. However, the Equine Act does not shield an operator from concealing a horse's dangerous tendencies in the context of a sale. If Ali had no known history of bolting, but bolted and injured a rider shortly

23

after being purchased, N.J.S.A. 5:15-9(d) would not be implicated. Whether defendants' failure to disclose Ali's history is characterized as an "act" or an "omission" under section (d), a fact issue arises as to whether this was in "negligent disregard for the participant's safety" under the Act. Although an individual may proceed with the purchase of a horse notwithstanding being apprised about a horse's propensities, the Act does not provide immunity for an operator's negligent or intentional misrepresentations regarding a horse's known purported dangerous propensities that had resulted in prior injuries to other riders.

The Hubner Court noted, "[u]nderstanding and harmonizing the statute's provisions requires us to see them in the context of an activity that has inherent risks and dangers that are beyond the ability of the operator to control." Id. at 204 (emphasis added). Defendants' alleged misrepresentations or failure to disclose information regarding the dangerous propensity of Ali were not inherent risks under the Act or beyond their control. Rather, defendants' representations were clearly within their control and are reasonably considered ordinary obligations under the Act.

Because defendants failed to disclose known incidents of Ali's bolting and causing injuries to other riders and represented to plaintiffs that Ali was suitable

for Jordan, we conclude plaintiffs have demonstrated factual issues under both N.J.S.A. 5:15-9(b) and (d) as to whether defendants can be immune from liability. Given plaintiffs' status as first-time horse owners and their reliance on defendants' representations and familiarity with Ali, a jury could find defendants mismatched the horse—knowing Ali suffered from back pain, was frail, too old, and too small for Jordan's size—with plaintiffs under section (b). Likewise, a jury could conclude defendants acted with negligent disregard for plaintiffs' safety under section (d) because defendants sold the horse without disclosing to an unsuspecting buyer Ali's propensity to bolt. In this respect, defendants' actions would not be considered an inherent risk in equine activity because they had control over mitigating the risks posed to Jordan, had they disclosed Ali's known proclivities.

Turning to the proximate cause issue, we note this was the first time Jordan had purchased a horse, and he had never taken horseback riding lessons. Plaintiffs assert they relied on defendants' representations that Ali was in good health, could be ridden safely by someone of Jordan's size, and that the horse would be appropriate for his daughter. They assert they would not have purchased the horse had they known Ali's bolting history or that the horse was not a good fit for Jordan. We determine the court erred in finding the cause of

the incident was the inherent danger in horse riding, when there is a factual issue of whether plaintiffs would have purchased the horse had they known Ali's history, and, in turn, whether this bolting incident would have occurred, leading to Jordan's injuries. A fact finder could reasonably conclude that had plaintiffs known of Ali's bolting tendencies, they would not have purchased the horse, and Jordan would not have sustained his injuries.

Although the <u>Hubner</u> decision provides guidance for this court in interpreting the Equine Act, it did not address issues regarding alleged misrepresentations concerning a horse's dangerous tendencies in the context of a sale. The Equine Act recognizes the inherent risks of equine animal activity—such as bolting—that can result in injuries to riders. N.J.S.A. 5:15-2. However, defendants' interpretation of the statute would allow owners to sell equine animals and conceal known dangerous propensities from unsuspecting buyers with no repercussions. We reject such an interpretation. In allocating the risks of equine activity, we are unconvinced the Legislature intended to immunize horse owners under the facts presented here. A buyer may be on notice under the Act regarding the inherent dangers of equine activity but is still entitled to a disclosure about a horse's known vices or propensities. The two concepts are not mutually exclusive.

A-2790-23

Plaintiffs presented evidence, coupled with expert testimony, that raised debatable issues of negligence and the existence of circumstances falling within the exceptions to the Act's statutory immunity. Plaintiffs may have assumed a risk under the statute in purchasing a horse, but they did not assume the risk of a misrepresentation. It is one thing to know that horses in general may have a tendency to behave in a way that can cause an injury, but it is another to be aware that a particular horse has in fact acted dangerously in the past and caused other riders serious injuries. Given Ali's purported dangerous history, plaintiffs had the right to know—to the extent defendants were aware of the history—prior to purchasing the horse.

The trial court, in part, rested its decision on the fact that the bolting incident occurred twelve weeks after the sale, as opposed to immediately thereafter. That the accident occurred twelve weeks later is not dispositive of whether there is a factual issue regarding whether the misrepresentation caused the accident.

In sum, we conclude, under the facts presented in this matter, defendants owed a duty to disclose Ali's vices or dangerous propensities and to properly assess plaintiffs' ability to safely manage Ali and that there are factual issues that need to be resolved as to both issues. Our interpretation of the Act does not

27

threaten to extinguish the statute's broad protective scope, but instead imposes common sense duties upon a seller of a horse. We conclude that viewing the evidence in a light most favorably to plaintiffs under Rule 4:46-2, the facts in this matter are not so one-sided that a reasonable jury could only find in favor of defendants. Accordingly, we reverse the trial court's order granting defendants summary judgment.

Reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-2790-23